**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

IPA TECHNOLOGIES INC.,

Plaintiff,

v.

GOOGLE LLC,

Defendant.

C.A. No. 1:18-cv-00318-RGA-SRF

# JOINT CLAIM CONSTRUCTION BRIEF

Dated: August 25, 2026

BAYARD, P.A.
Stephen B. Brauerman (#4952)
Ronald P. Golden III (#6254)
600 N. King Street, Suite 400
Wilmington, DE 19801
(302) 655-5000

*Of Counsel:*

Paul J. Skiermont
Jaime K. Olin
Steven W. Hartsell
Kevin P. Potere
Todd A. Martin
SKIERMONT DERBY LLP
1601 Elm Street, Suite 4400
Dallas, TX 75201
(214) 978-6600

Mieke K. Malmberg
SKIERMONT DERBY LLP
633 West Fifth Street, Suite 5800
Los Angeles, CA 90071
(213) 788-4500

*Attorneys for Plaintiff*
*IPA Technologies Inc.*

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Rodger D. Smith II (#3778)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19801
(302) 658-9200

*Of Counsel:*

Michael C. Hendershot
Evan McLean
Matthew Everts
Walter Mostowy
JONES DAY
1755 Embarcadero Road
Palo Alto, CA 94303
(650) 739-3939

*Attorneys for Defendant*
*Google LLC*

**TABLE OF CONTENTS**


I. REPRESENTATIVE CLAIM ..... 1

II. Agreed-Upon Constructions ..... 2

III. DISPUTED CONSTRUCTIONS ..... 5

A. "request for a service" / "service request" ..... 5

1. IPA's Opening Position ..... 5

2. Google's Answering Position ..... 8

3. IPA's Reply Position ..... 10

4. Google's Sur-Reply Position ..... 13

B. Preambles ..... 15

1. IPA's Opening Position ..... 16

2. Google's Answering Position ..... 18

3. IPA's Reply Position ..... 20

4. Google's Sur-Reply Position ..... 21

C. Order of Steps ..... 22

1. IPA's Opening Position ..... 22

2. Google's Answering Position ..... 25

a. The Claim Language Requires That The Steps Be Performed In The Order Written 25

b. The Intrinsic Record Confirms The Required Order ..... 27

c. IPA's Arguments and Authorities Do Not Compel A Different Result ..... 27

3. IPA's Reply Position ..... 28

4. Google's Sur-Reply Position ..... 30

D. "registering a description of each active client agent's functional capabilities as corresponding registered functional capabilities" / "registering the specific agent together with the new agent profile within the agent registry" / "registering one or more capabilities for each of the electronic agents" ..... 31

1. IPA's Opening Position ..... 32

2. Google's Answering Position ..... 33

a. In *IPA/Amazon*, IPA successfully argued that the facilitator is "vital" to registering agents' capabilities in "the patented invention" ..... 34

b. The Specification Ties Registering Agent Capabilities Transmitted to The Facilitator To The "Present Invention" and Its Stated Purpose ..... 35

c. The Specification Repeatedly and Consistently Describes Registration as Involving Transmission of an Agent's Capabilities to a Facilitator ..... 36

d. IPA's Arguments Are Unavailing and Ignore The Specification ..... 39

3. IPA's Reply Position........................................................................................ 40

4. Google's Sur-Reply Position .................................................................................. 42

E. "providing an agent registry data structure" / "providing an agent registry that declares capabilities of service providing electronic agents currently active within the distributed computing environment" / "providing a plurality of synchronized agent registries each declaring capabilities of service-providing agents currently active within the distributed computing environment" / "providing a plurality of synchronized agent registries each declaring a set of functional capabilities for one or more of the autonomous service-providing electronic agents"................................................................................................................ 43

1. IPA's Opening Position ......................................................................................... 44

2. Google's Answering Position ................................................................................. 46

3. IPA's Reply Position........................................................................................ 46

4. Google's Sur-Reply Position .................................................................................. 46

F. "active client agent" / "active agent" / "agent currently active"................................. 46

1. IPA's Opening Position ......................................................................................... 47

2. Google's Answering Position ................................................................................. 48

3. IPA's Reply Position........................................................................................ 50

4. Google's Sur-Reply Position .................................................................................. 51

G. "ICL" / "inter-agent communication language" / "inter-agent language".................... 52

1. IPA's Opening Position ......................................................................................... 52

2. Google's Answering Position ................................................................................. 56

a. The Specification Disavows RPC By Both Repeatedly Disparaging It And Expressly Distinguishing It From The Invention And ICL ........................................ 56

b. IPA's Arguments Mischaracterize The History And The Evidence..................... 59

c. IPA's Extrinsic Evidence Is Inapposite Because It Is Not At The Appropriate Level Of Skill And Is Not Contemporaneous ............................................................ 61

3. IPA's Reply Position........................................................................................ 62

a. The Patentee Did Not Disclaim Any Specific RPCs ........................................... 62

b. The Patentee Did Not Disclaim RPCs Generally ................................................ 65

4. Google's Sur-Reply Position .................................................................................. 67

# TABLE OF AUTHORITIES

**Cases**


*ACTV, Inc. v. Walt Disney Co.*,
346 F.3d 1082 (Fed. Cir. 2003)....................47

*Allergan, Inc. v. Revance Therapeutics, Inc.*,
C.A. No. 21-cv-1411-RGA, 2023 WL 5562417 (D. Del. Aug. 29, 2023)....................64, 69

*Altiris, Inc. v. Symantec Corp.*,
318 F.3d 1363 (Fed. Cir. 2003)....................23, 24, 25, 27, 28, 31

*Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*,
692 F. Supp. 2d 487 (M.D. Pa. 2010)....................11

*Aspex Eyewear, Inc. v. Zenni Optical Inc.*,
713 F.3d 1377 (Fed. Cir. 2013)....................8

*Baldwin Graphic Sys., Inc. v. Siebert, Inc.*,
512 F.3d 1338 (Fed. Cir. 2008)....................22, 25

*Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*,
616 F.3d 1249 (Fed. Cir. 2010)....................12, 40

*Bicon, Inc. v. Straumann Co.*,
441 F.3d 945 (Fed. Cir. 2006)....................16, 20

*Brookhill-Wilk 1, LLC. v. Intuitive Surgical, Inc.*,
334 F.3d 1294 (Fed. Cir. 2003)....................62

*C.W. Zumbiel Co. v. Kappos*,
702 F.3d 1371 (Fed. Cir. 2012)....................19

*Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*,
289 F.3d 801 (Fed. Cir. 2002)....................16, 17, 20

*CFL Techs. LLC v. Osram Sylvania, Inc.*,
C.A. No. 18-cv-1445-RGA, 2022 WL 606329 (D. Del. Jan. 21, 2022)....................33, 45

*Chicago Bd. Options Exch., Inc. v. Int'l Sec. Exch., LLC*,
677 F.3d 1361 (Fed. Cir. 2012)....................64

*Corrigent Corp. v. Dell Techs. Inc.*,
C.A. No. 22-496, 2024 WL 2747047 (D. Del. May 29, 2024)....................31

*Dealertrack, Inc. v. Huber*,
674 F.3d 1315 (Fed. Cir. 2012)....................62

*Ecolab, Inc. v. FMC Corp.*,
569 F.3d 1335 (Fed. Cir. 2009)....................54

*Eon Corp. IP Holdings v. Silver Spring Networks*,
815 F.3d 1314 (Fed. Cir. 2016)....................39

*Epistar Corp. v. Int'l Trade Comm'n*,
566 F.3d 1321 (Fed. Cir. 2009)....................64

*Forest Laboratories, Inc. v. Abbott Laboratories*,
239 F.3d 1305 (Fed. Cir. 2001)....................................................................................40

*GPNE Corp. v. Apple Inc.*,
830 F.3d 1365 (Fed. Cir. 2016)....................................................................................36

*Hand Held Prods., Inc. v. Amazon.com, Inc.*,
C.A. No. 12-cv-768-RGA-MPT, 2014 WL 2873902 (D. Del. June 24, 2014) ........................24

*Hand Held Prods., Inc. v. Amazon.com, Inc.*,
C.A. No. 12-cv-768-RGA-MPT, 2014 WL 5779416 (D. Del. Nov. 5, 2014)..........................24

*Hill-Rom Servs., Inc. v. Stryker Corp.*,
755 F.3d 1367 (Fed. Cir. 2014)................................................................35, 41, 42, 43, 58, 59

*Hoganas AB v. Dresser Indus., Inc.*,
9 F.3d 948 (Fed. Cir. 1993)..........................................................................................46

*Hytera Commc'ns Co. v. Motorola Sols., Inc.*,
841 F. App'x 210 (Fed. Cir. 2021)................................................................................26

*IMS Tech., Inc. v. Haas Automation, Inc.*,
206 F.3d 1422 (Fed. Cir. 2000)....................................................................................21

*Indivior Inc. v. Dr. Reddy's Labs.*,
930 F.3d 1325 (Fed. Cir. 2019)..........................................................................56, 57, 69

*Innovad Inc. v. Microsoft Corp.*,
260 F.3d 1326 (Fed. Cir. 2001)....................................................................................10

*Interactive Gift Express, Inc. v. Compuserve Inc.*,
256 F.3d 1323 (Fed. Cir. 2001)...............................................................................22, 23

*IPA Technologies Inc. v. Amazon.com, Inc.*,
C.A. No. 1:16-cv-1266 (D. Del. May 21, 2020) (D.I. 126) .....................................................52

*IPA Technologies Inc. v. Amazon.com, Inc.*,
C.A. No. 1:16-cv-1266 (D. Del. May 26, 2020) (D.I. 128) ...............................................32, 44

*IPA Technologies Inc. v. Microsoft Corp.*,
C.A. No. 1:18-cv-00001 (D. Del. May 2, 2024) (D.I. 357) .....................................................52

*Iridescent Networks v. AT&T Mobility, LLC*,
933 F.3d 1345 (Fed. Cir. 2019)....................................................................................59

*Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc.*,
458 F.3d 244 (3d Cir. 2006)..........................................................................................10

*Karlin Tech. Inc. v. Surgical Dynamics, Inc.*,
177 F.3d 968 (Fed. Cir. 1999).................................................................................33, 45

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
358 F.3d 898 (Fed. Cir. 2004).................................................................................42, 51

*Mantech Env't Corp. v. Hudson Env't Servs., Inc.*,
152 F.3d 1368 (Fed. Cir. 1998)....................................................................................23

*Nat'l R.R. Passenger Corp. v. Pa. Pub. Util. Comm'n*,
342 F.3d 242 (3d Cir. 2003)........................................................................................ 8

*Nestle USA, Inc. v. Steuben Foods, Inc.*,
884 F.3d 1350 (Fed. Cir. 2018)................................................................................... 10

*Nimbelink Corp. v. Digi Int'l Inc.*,
No. 2024-2292, 2026 WL 492037 (Fed. Cir. Feb. 23, 2026) .............. 16, 17, 18, 19, 20, 21, 22

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
521 F.3d 1351 (Fed. Cir. 2008)................................................................................... 39

*Oak Tech., Inc. v. Int'l Trade Comm'n*,
248 F.3d 1316 (Fed. Cir. 2001)................................................................................... 31

*Omega Eng'g, Inc. v. Raytek Corp.*,
334 F.3d 1314 (Fed. Cir. 2003)................................................................................... 62

*Openwave Sys., Inc. v. Apple Inc.*,
808 F.3d 509 (Fed. Cir. 2015)............................................................................. 63, 65

*Pfaff v. Wells Elecs., Inc.*,
5 F.3d 514 (Fed. Cir. 1993)........................................................................................ 8

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005)........................................................... 7, 13, 30, 33, 44, 45, 53

*Pitney Bowes, Inc., v. Hewlett-Packard Co.*,
182 F.3d 1298 (Fed. Cir. 1999)............................................................................... 5, 19

*Renishaw PLC v. Marposs Societa' per Azioni*,
158 F.3d 1243 (Fed. Cir. 1998)................................................................................... 56

*RF Delaware, Inc. v. Pacific Keystone Techs., Inc.*,
326 F.3d 1255 (Fed. Cir. 2003)................................................................................... 11

*Sanofi-Aventis U.S. LLC v. Merck Sharp & Dohme Corp.*,
C.A. No. 16-cv-812-RGA, 2018 WL 389183 (D. Del. Jan. 12, 2018) ..................................... 65

*Sci. Applications Int'l Corp. v. United States*,
169 Fed. Cl. 643 (2024) ............................................................................................ 25, 29

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*,
242 F.3d 1337 (Fed. Cir. 2001)............................................................................. 56, 62

*Seachange Int'l, Inc. v. C-COR, Inc.*,
413 F.3d 1361 (Fed. Cir. 2005)................................................................................... 43

*Sequoia Tech., LLC v. Dell, Inc.*,
66 F.4th 1317 (Fed. Cir. 2023) ............................................................................. 35, 49

*SightSound Techs., LLC v. Apple Inc.*,
809 F.3d 1307 (Fed. Cir. 2015)................................................................................... 31

*Sound View Innovations, LLC v. Hulu, LLC*,
166 F.4th 958 (Fed. Cir. 2026) ............................................................................. 26, 30

*Sprint Commc'ns Co. L.P. v. Cequel Commc'ns, LLC*,
No. 18-1919-RGA, 2020 WL 3048175 (D. Del. June 8, 2020) ........ 10

*Storage Tech. Corp. v. Cisco Sys., Inc.*,
329 F.3d 823 (Fed. Cir. 2003) ........ 16

*Taction Tech., Inc. v. Apple Inc.*,
No. 2023-2349, 2025 WL 2336950 (Fed. Cir. Aug. 13, 2025) ........ 65, 69

*Taylor v. Sturgell*,
553 U.S. 880 (2008) ........ 11

*Thorner v. Sony Comput. Ent. Am. LLC*,
669 F.3d 1362 (Fed. Cir. 2012) ........ 62

*T-Jat Sys. 2006 Ltd. v. Expedia, INC. (DE)*,
C.A. No. 16-cv-581-RGA, 2019 WL 3944014 (D. Del. Aug. 21, 2019) ........ 65

*TomTom, Inc. v. Adolph*,
790 F.3d 1315 (Fed. Cir. 2015) ........ 18

*Trs. of Columbia Univ. v. Symantec Corp.*,
811 F.3d 1359 (Fed. Cir. 2016) ........ 35

*Vifor Fresenius Med. Care Renal Pharma Ltd. v. Annora Pharma Private Ltd.*,
C.A. No. 18-cv-1996 (MN), 2020 WL 2085634 (D. Del. Apr. 30, 2020) ........ 64, 69

*Vitronics Corp. v. Conceptronic, Inc.*,
90 F.3d 1576 (Fed. Cir. 1996) ........ 55

*Xerox Corp. v. Google Inc.*,
801 F. Supp. 2d 293 (D. Del. 2011) ........ 25

## TABLE OF EXHIBITS

| Exhibit # | Description |
|---|---|
| **A** | U.S. Patent No. 6,851,115[1] |
| **B** | U.S. Patent No. 7,069,560[2] |
| **C** | U.S. Patent No. 7,036,128[3] |
| **D** | File History for U.S. Patent No. 6,851,115[4] |
| **E** | File History for U.S. Patent No. 7,069,560[5] |
| **F** | File History for U.S. Patent No. 7,036,128[6] |
| **G** | Microsoft Computer Dictionary, Fourth Edition (1999) |
| **H** | Windows 95 Administration Guide (1997) |
| **I** | "Making GWT better" article |
| **J** | "Implementing Remote Procedure Calls" article (1984) |
| **K** | Hearing transcript in *IPA Techs. Inc. v. Amazon.com, Inc.*, C.A. No. 16-1266-RGA, dated May 14, 2020. |

[1] Exhibit A can be found at D.I. 1-1.
[2] Exhibit B can be found at D.I. 1-2.
[3] Exhibit C can be found at D.I. 1-3.
[4] Exhibit D can be found at D.I. 117.
[5] Exhibit E can be found at D.I. 118.
[6] Exhibit F can be found at D.I. 119.

Pursuant to the April 2, 2026 Amended Scheduling Order entered in this case (D.I. 106), IPA Technologies Inc. and Google LLC submit this Joint Claim Construction Brief concerning the following patents:

- U.S. Patent No. 6,851,115 (hereinafter, the "'115 Patent"),
- U.S. Patent No. 7,069,560 (hereinafter, the "'560 Patent"), and
- U.S. Patent No. 7,036,128 (hereinafter, the "'128 Patent)

(collectively, the "Patents-In-Suit").

## I. REPRESENTATIVE CLAIM

For claim construction purposes, claim 29 of the '115 Patent is representative:

**29.** A computer program stored on a computer readable medium, the computer program executable to facilitate cooperative task completion within a distributed computing environment, the distributed computing environment including a plurality of autonomous electronic agents, the distributed computing environment supporting an Interagent Communication Language, the computer program comprising computer executable instructions for:

> providing an agent registry that declares capabilities of service-providing electronic agents currently active within the distributed computing environment;
>
> interpreting a service request in order to determine a base goal that may be a compound, arbitrarily complex base goal, the service request adhering to an Interagent Communication Language (ICL), where in the ICL includes:
>
> > a layer of conversational protocol defined by event types and parameter lists associated with one or more of the events, wherein the parameter lists further refine the one or more events; and
> >
> > a content layer comprising one or more of goals, triggers and data elements associated with the events;
>
> the act of interpreting including the sub-acts of:
>
> > determining any task completion advice provided by the base goal, and
> >
> > determining any task completion constraints provided by the base goal;
> >
> > constructing a base goal satisfaction plan including the sub-acts of:

determining whether the request service is available,

determining sub-goals required in completing the base goal by using reasoning that includes one or more of domain-independent coordination strategies, domain-specific reasoning, and application-specific reasoning comprising rules and learning algorithms,

selecting service-providing electronic agents from the agent registry suitable for performing the determined sub-goals, and

ordering a delegation of sub-goal requests complete the requested service; and

implementing the base goal satisfaction plan.

## II. AGREED-UPON CONSTRUCTIONS

| Term/Phrase (Patent/Claims) | Agreed Construction |
|---|---|
| "arbitrarily complex goal expression"/ "arbitrarily complex base goal"/ "arbitrarily complex goal"<br><br>'115 patent: claims **9, 10, 29-45** | "a single goal expression expressed in a language or syntax that allows- multiple sub-goals and potentially includes more than one type of logical connector (e.g., AND, OR, NOT), and/or more than one level of logical nesting (e.g., use of parentheses), or the substantive equivalent" (as construed in the Amazon and Microsoft cases) |
| "base goal"<br><br>'115 patent: claims **9, 10, 29-45**<br>'560 patent: claims **50, 51, 53-55** | "starting goal" (as construed in the Amazon and Microsoft cases) |
| "cooperative task completion / cooperative completion of the base goal"<br><br>'115 patent: claims **9, 10, 29-45**<br>'560 patent: claims **50, 51, 53-55** | plain and ordinary meaning (as construed in the Amazon and Microsoft cases) |
| "layer of conversational protocol"<br><br>'115 patent: claims **9, 10, 29-45**<br>'560 patent: claims **50, 51, 53-55**<br>'128 patent: claims **23-27, 40** | "a layer which governs the structure of interagent communications" (as construed in the Microsoft case) |

| Term/Phrase (Patent/Claims) | Agreed Construction |
|---|---|
| "layer"<br><br>'115 patent: claims **9, 10, 29-45**<br>'560 patent: claims **50, 51, 53-55**<br>'128 patent: claims **23-27, 40** | "a set of rules that are a part of the ICL" (as construed in the Microsoft case) |
| "a content layer"<br><br>'115 patent: claims **9, 10, 29-45** | "a layer, which specifies the content of interagent messages" (as construed in the Amazon and Microsoft cases) |
| "event"<br><br>'115 patent: claims **9, 10, 29-45**<br>'560 patent: claims **50, 51, 53-55**<br>'128 patent: claims **23-27, 40** | "a message between agents or between an agent and a facilitator" (as construed in the Amazon and Microsoft cases) |
| "non-syntactic decomposition"<br><br>'560 patent: claims **50, 51, 53-55** | "separating or resolving into constituent parts based on factors other than syntax" (as construed in the Amazon and Microsoft cases) |
| "trigger"<br><br>'115 patent: claims **9, 10, 29-45**<br>'128 patent: claim 26 | "a settable mechanism for taking or requesting action when a condition or set of conditions is met" (as construed in the Amazon and Microsoft cases) |
| "event type(s)"<br><br>'115 patent: claims **9, 10, 29-45**<br>**50, 51, 53-55**<br>'128 patent: claims **23-27, 40** | "type of event" (as construed in the Amazon and Microsoft cases) |
| "ICL goal(s)"<br><br>'128 patent: claims **23-27, 40** | "goal(s) formulated in ICL" (as construed in the Amazon and Microsoft cases) |
| "parameter lists associated with one or more events" / "wherein the parameter lists further refine the one or more events"<br><br>All claims | "lists of parameters that refine associated events" (as construed in the Amazon and Microsoft cases) |
| "task completion advice"<br><br>'115 patent: claims **29-45** | "one or more parameters containing advice on how to execute a task" (as construed in the Microsoft case) |

| **Term/Phrase (Patent/Claims)** | **Agreed Construction** |
|---|---|
| | |
| "task completion constraints"<br><br>'115 patent: claims **29-45** | "one or more parameters containing constraints on how to execute a task" (as construed in the Microsoft case) |
| "capability"<br><br>'115 patent: claim **33** | "a function an agent can perform" (as construed in the Microsoft case) |
| "symbolic name"<br><br>'115 patent: claim **33** | "a name that is used to identify an agent and need not be unique" (as construed in the Microsoft case) |
| "task declaration"<br><br>'115 patent: claim **33** | "a statement of an agent task" (as construed in the Microsoft case) |
| "goal satisfaction plan"<br><br>'115 patent: claims **9, 10, 29-45**<br>'560 patent: claims **50-51** | "plan for satisfying a goal that includes delegating sub-goals to specific agents, is not limited to asking service providing agents to retrieve information, and is consistent with advice parameters" (as construed in the Microsoft case) |
| "sub-goal"<br><br>'115 patent: claims **9, 10, 29-45**<br>'560 patent: **50, 51, 53-55**<br>'128 patent: claims **23-27, 40** | "subgoals, when not modified by 'one or more,' means "two or more subgoals" (as construed in the Microsoft case) |
| "compound goal" / "complex goal"<br><br>'115 patent: claims **29-45** | "a single-goal expression comprising multiple sub-goals" (as construed in the Amazon and Microsoft cases) |

## III. DISPUTED CONSTRUCTIONS

### A. "request for a service" / "service request"

| IPA's Construction | Google's Construction | Why Resolution Matters |
|---|---|---|
| No construction needed; plain and ordinary meaning.<br><br>However, to the extent the Court determines that a specific construction is warranted: "a user request" | "a user request that is recited in the claimed ICL and must meet every requirement of the claimed ICL" | IPA's position: A construction, even if plain and ordinary meaning, will help clarify what IPA needs to prove for infringement and what Google must prove for invalidity.<br><br>Google's position: Resolution may impact validity and/or infringement, and may assist the jury. |

#### 1. IPA's Opening Position

All claims of the Asserted Patents directly support IPA's proposal that the term "service request" / "request for a service" should be given its plain and ordinary meaning, which is "user request." Claim 29 of the '115 patent, for example, recites "interpreting a service request in order to determine a base goal." (Ex. A, 31:59-60.) A "service request" must therefore contain the information needed to determine a goal so that it can be interpreted to determine a base goal. That action must start with a user request. *See Pitney Bowes, Inc., v. Hewlett-Packard Co.*, 182 F.3d 1298, 1305 (Fed. Cir. 1999) ("The starting point for any claim construction must be the claims themselves."). Notably, Google does not dispute that "user request" should be the subject of the construction.

The specification also depicts the service request as a user request. For example, Figure 10 shows the system receiving a request for service, parsing that request, and performing the requested service:



Fig. 10

The specification notes that "FIG 10 depicts operations involved in a client agent responding to a service request . . . ." (Ex. A, 18:12-13.) Similarly, "FIG 11 depicts operations involved in a facilitator agent response to a service request . . . ." (*Id.*, 18:29-30):[7]

[7] In certain blocks in Figure 11, service requests are labeled as "goal requests," but the specification makes clear that these blocks actually represent service requests. (Ex. A, 5:48-50; 18:29-34.)




Fig. 11

In both embodiments, the service request is the request from the user that initiates the process of goal satisfaction. In sum, therefore, "service request" is a commonly understood term that does not require more than the application of the widely accepted meaning of that term—a "user request." *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) ("In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words.").

**2. Google's Answering Position**

Google proposes the construction already issued by this Court in the Microsoft case.[8] (*IPA Techs. Inc. v. Microsoft Corp.*, C.A. No. 18-01-RGA ("*IPA/Microsoft*"), D.I. 104 at 5; D.I. 131 at 6). Despite the Court twice construing "service request / request for service" to be recited in the claimed ICL and meet every requirement of the claimed ICL, IPA is yet again trying to fight this construction. But not only is the construction correct on the merits, IPA is collaterally estopped from taking a contrary position based on both *IPA/Amazon* and *IPA/Microsoft*.

"[W]here a determination of the scope of patent claims was made in a prior case, and the determination was essential to the judgment there on the issue of infringement, there is collateral estoppel in a later case on the scope of such claims." *Pfaff v. Wells Elecs., Inc.*, 5 F.3d 514, 518 (Fed. Cir. 1993). Regional circuit law applies to questions of collateral estoppel. *Aspex Eyewear, Inc. v. Zenni Optical Inc.*, 713 F.3d 1377, 1380 (Fed. Cir. 2013). In the Third Circuit, "[t]he elements for collateral estoppel are satisfied when: (1) the issue sought to be precluded is the same as that involved in the prior action; (2) that issue was actually litigated; (3) it was determined by a final and valid judgment; and (4) the determination was essential to the prior judgment." *Nat'l R.R. Passenger Corp. v. Pa. Pub. Util. Comm'n*, 342 F.3d 242, 252 (3d Cir. 2003) (cleaned up).

***First***, *IPA/Amazon* estops IPA from disputing that the request is "recited in the claimed ICL and must meet every requirement of the claimed ICL." There, the same issue of whether the service request had to meet every requirement of the ICL was presented and litigated on summary judgment. As the Court explained: "Amazon argues that Alexa does not have a service request in the ICL because SIRF does not include the layer of conversational protocol required in the ICL.

[8] The Court relied on a very similar interpretation in *IPA Techs. Inc. v. Amazon.com, Inc.*, C.A. No. 16-1266-RGA ("*IPA/Amazon*"), D.I. 118, 129, 126 when granting summary judgment, holding that "the service request must be recited in the claimed ICL and must meet every requirement of the claimed ICL" *Id.* D.I. 405 at 1, 6; D.I. 416, *reh'g denied*, D.I. 415).

IPA responds that the claims do not require that the service request 'contain every component of ICL, only what is needed to represent the request.'" *IPA/Amazon*, D.I. 405 at 6 (citations omitted). The Court held that "[n]othing in this claim language supports a service request adhering only to a selected portion of the ICL" and granted summary judgment of non-infringement. *Id.* IPA raised this construction on appeal, arguing: "[T]he service request may use only the content layer of the ICL ***without requiring the service request to also use the layer of conversational protocol***."[9] No. 2022-1193, D.I. 13 at 39. But the Federal Circuit affirmed. *IPA/Amazon*, D.I. 405 at 1, 6; D.I. 416, *reh'g denied*, D.I. 415. Thus, the issue (1) is the same as in *IPA/Amazon*; (2) was actually litigated both before the Court and on appeal; (3) was part of a final judgment; and (4) was essential to that judgment, as it was the ground on which Amazon prevailed.

***Second***, *IPA/Microsoft* estops IPA from disputing both "a user request" and "recited in the claimed ICL and must meet every requirement of the claimed ICL." There, the parties disputed the term's construction and then agreed to the construction now proposed by Google, which the Court adopted. *IPA/Microsoft*, D.I. 143 at 4. At summary judgment, the Court ordered additional claim construction briefing on the issue. IPA then argued that a service request need not be a "user request" and need not itself meet every ICL requirement but rather merely "contain[] the information needed to determine a goal" that would meet ICL requirements. *IPA/Microsoft*, D.I. 341 at 24-25. The Court rejected IPA's arguments, including based on IPA's position in the Amazon appeal that a service request is "the task(s) that the user asked the system to perform." *Id.* at 26. The Court construed "service request" as "a user request that is recited in the claimed ICL and must meet every requirement of the claimed ICL." *Id.* at 24-28. The jury then applied that construction to find Microsoft infringed and the Court entered judgment. *IPA/Microsoft*, D.I. 372.

---

[9] Emphasis is added unless otherwise noted.

IPA is collaterally estopped from relitigating the construction here, as it was (1) the same issue; (2) actually litigated at summary judgment and in supplemental Markman briefing; (3) part of the final judgment; and (4) an essential element of Microsoft's infringement.

This construction is also consistent with the intrinsic evidence. Embodiments in the specification consistently show service requests as user requests translated into ICL. *See, e.g.*, '115 patent, 14:14-16 ("'Send mail to Bob about lunch' [that] will be translated into an ICL request"), 15:29-33 ("the spoken utterance 'Fax it to Bill Smith's manager.' can be translated into the following compound ICL request"), 8:17-22 ("The spoken request 'When mail arrives for me about security, notify me immediately.' … After translation into ICL as described above, the facilitator installs a trigger 440 on the mail agent 442 to look for new messages about security."). These requirements are also clear from the claim language itself, as acknowledged by the Court: "[C]laim 50 of the '560 patent requires 'the service request adhering to the [ICL], the ICL including a layer of conversational protocol' … [which] shows that the service request must be recited in the claimed ICL and must meet every requirement of the claimed ICL." *IPA/Amazon*, D.I. 405 at 6. IPA offers no persuasive reason to depart from the Court's prior construction.

### 3. IPA's Reply Position

Under either Federal Circuit[10] or Third Circuit precedent, in a collateral estoppel analysis, courts consider whether the party being precluded "had a full and fair opportunity to litigate the issue in question in the prior action." *Sprint Commc'ns Co. L.P. v. Cequel Commc'ns, LLC*, No. 18-1919-RGA, 2020 WL 3048175, at *2 (D. Del. June 8, 2020) (quoting *Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc.*, 458 F.3d 244, 249 (3d Cir. 2006)); *see also Innovad Inc. v. Microsoft Corp.*, 260 F.3d 1326, 1334 (Fed. Cir. 2001) ("Issue preclusion operates only if: . . . (4)

[10] *See Nestle USA, Inc. v. Steuben Foods, Inc.*, 884 F.3d 1350, 1351 (Fed. Cir. 2018) ("We apply our precedent on collateral estoppel when claim construction is involved.").

the party against whom estoppel is invoked had a full and fair opportunity to litigate the issue in the first action"); *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008) (noting that a full and fair opportunity to litigate is the touchstone of any preclusion analysis).

The Federal Circuit has held that issue preclusion does not apply to claim construction where no evidentiary hearing was conducted to construe the claims. *See RF Delaware, Inc. v. Pacific Keystone Techs., Inc.*, 326 F.3d 1255, 1262 (Fed. Cir. 2003) ("[T]here is no evidence that an evidentiary hearing was conducted to construe the claims of either patent before the orders were issued. . . . Thus, it is questionable whether the parties were 'fully heard.'"); *compare Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, 692 F. Supp. 2d 487, 499 (M.D. Pa. 2010) (explaining that the Federal Circuit has allowed parties to request collateral estoppel on claim construction when a first court conducted a thorough *Markman* hearing).

Like the plaintiff in *RF Delaware* and contrary to the plaintiff in *Arlington*, IPA did not have a full and fair opportunity to participate in claim construction on the term "service request" and should not be precluded from doing so now. In *Amazon*, the Court did not include "service request" in its claim construction order (Case 1:16-cv-1266, D.I. 126, 128) because neither party asked the Court to construe the term. (*Id.*, D.I. 119.) The term was neither briefed nor argued during *Markman* or summary judgment. In the order on Amazon's summary judgment motion, however, the Court held "the service request must be recited in the claimed ICL and must meet every requirement of the claimed ICL." (*Id.*, D.I. 405 at 6.) The Court's construction was provided without the benefit of party briefing or argument. That is not a "full and fair opportunity" under Federal Circuit precedent.

Nor does IPA's appeal of the Court's summary judgment decision change anything. Under Federal Circuit law, whether "the party against whom estoppel is invoked had a full and fair

opportunity to litigate" is a separate factor from whether the decision on the issue was final. Furthermore, because the Court's construction was provided in the context of summary judgment and not during *Markman*, IPA could not appeal the *Markman* decision itself: "service request" was not part of the *Markman* proceedings, so there was nothing to appeal.[11]

In sum, because IPA did not have a full and fair opportunity to participate in claim construction of the term "service request" in *Amazon*,[12] it should not be estopped from doing so now.

As to the merits, Google's proposed claim construction creates a paradox in the claims. Specifically, asserted claims 35 and 36 of the '115 patent both recite a "**non-ICL** format service request." Google's proposed construction would nonsensically mandate that this "**non-ICL** format service request" is "recited in the claimed ICL and must meet every requirement of the claimed ICL." A service request in "non-ICL format" cannot possibly meet every requirement of an ICL, as Google's construction requires. *Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*, 616 F.3d 1249, 1255 (Fed. Cir. 2010) ("A claim construction that renders asserted claims facially nonsensical 'cannot be correct.'").

Google's position also conflicts with unasserted claims that disclose service requests recited in a non-ICL. Claims 12 through 15 of the '115 patent recite "receiving a request for service in a second language ***differing from inter-agent language***." While unasserted, these claims still shed light on the meaning of the term—a service request cannot meet every requirement of the

---

[11] In addition, the Federal Circuit affirmed the Court's summary judgment order in a Rule 36 decision, meaning the appellate decision provided no guidance as to whether the Court's construction was correct. (Case No. 2022-1193, Judgment.)

[12] As Google acknowledges, the parties in *Microsoft* agreed to Google's now-proposed construction of "service request" and the Court adopted that construction. This agreement/adoption does not amount to the issue being fully and actually litigated, as required under both Federal Circuit and Third Circuit precedent.

ICL when the service request is in a non-ICL language. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (claims "both asserted and unasserted, can also be valuable sources of enlightenment as to the meaning of a claim term."). Further, the specification contemplates non-ICL service requests. Certain embodiments translate requests ***into*** the ICL. (Ex. A, 8:4-13.) That means the requests were in a non-ICL language before translation.

The claims themselves provide all the language needed to understand the disputed term. When the patentee wanted to claim a connection between a request for service and an ICL, it provided one in the claims. For example, in claim 1 of the '115 patent, the term "a request for service" is modified by the clause "in the inter-agent language." Similarly, claim 29 of the '115 patent and claims 50 and 53 of the '560 patent recite a "service request" with language that clarifies that the service request adheres "to an Interagent Communication Language."

The parties agree that a "service request" is "a user request." No additional construction is necessary.

**4. Google's Sur-Reply Position**

After initially arguing no construction was necessary, IPA now concedes that a "service request" is at least a "user request." The only remaining dispute is whether it "is recited in the claimed ICL and must meet every requirement of the claimed ICL." Collateral estoppel from both *IPA/Amazon* and *IPA/Microsoft*, as well as the specification, mandates that it must.

Regarding *IPA/Amazon*, IPA's sole argument is that it was deprived an adequate opportunity to litigate the construction because it was "neither briefed nor argued during *Markman* or summary judgment." *Supra* at 11. Not so; the issue was fully joined on summary judgment. Indeed, IPA opposed Amazon's non-infringement motion, which focused on the claims' "'service request' in the inter-agent language or ICL" (*IPA/Amazon*, D.I. 310 at 8), by arguing the claims do "not require that the 'request for service' contain *every* component of ICL." *IPA/Amazon*, D.I. 352

at 7 (emphasis original). The Court heard argument on this issue (*IPA/Amazon*, D.I. 401), rejected IPA's argument, and granted summary judgment, explaining "[n]othing in this claim language supports a service request adhering only to a selected portion of the ICL." *IPA/Amazon*, D.I. 405 at 6 (citations omitted).

Moreover, contrary to IPA's current contention, IPA appealed this construction, identifying the very issue for resolution: "Whether the district court erred in ***construing 'receiving a request for service as a base goal in [or "adhering to" or "formed according to"] the inter-agent language'***…?" No. 2022-1193, D.I. 13 at 3-4; *see also id.* at 39 (IPA arguing: a "service request may use only the content layer of the ICL ***without requiring the service request to also use the layer of conversational protocol***."). Regarding *IPA/Microsoft*, IPA argues estoppel cannot apply because the construction was agreed upon. But, as Google explained in its Response and IPA ignored, after initially agreeing, the Court ordered additional claim-construction briefing on the issue and IPA walked back its agreement, arguing that the request need not meet every ICL requirement but may merely "contain[] the information needed to determine a goal." *IPA/Microsoft*, D.I. 341 at 24-25. The Court again rejected this argument and construed service request as "a user request that is recited in the claimed ICL and must meet every requirement of the claimed ICL." *Id.* at 24. This issue was thus fully litigated in both *IPA/Microsoft* and *IPA/Amazon* and estops IPA here.

IPA's sole cited case turned on whether the prior judgement was sufficiently final to support estoppel, not whether the party had an opportunity to litigate. *See RF Delaware*, 326 F.3d at 1261-62 ("Pacific [cannot] … invoke collateral estoppel because the standard for judicial finality is not satisfied."). IPA does not contest finality here, so this case is inapplicable.

In any event, the Court's prior construction of "service request" (which Google proposes) is correct on the merits and dictated by the claim language. As the Court explained: "[C]laim 50 of the '560 patent requires 'the service request adhering to the [ICL], the ICL including a layer of conversational protocol' … [which] shows that the service request must be recited in the claimed ICL and must meet every requirement of the claimed ICL." *IPA/Amazon*, D.I. 405 at 6. The specification is consistent. *Supra* at 10.

IPA's reliance on dependent claims 35 and 36 reciting an additional "non-ICL format service request" is misplaced. By definition, dependent claims narrow—not broaden—independent claims, and claims 35 and 36 still require translation into ICL before receipt/processing.[13]

Finally, IPA's suggestion that no additional construction is necessary in view of the claim language is belied by its argument in *IPA/Amazon* that the claims did ***not*** require all of the claimed ICL and its attempt to walk back its agreement on this point in *IPA/Microsoft*.

**B. Preambles**

| IPA's Construction | Google's Construction | Why Resolution Matters |
|---|---|---|
| Specified portions of the preambles are not limiting | Preambles are limiting | IPA's position: Resolution will help clarify what IPA needs to prove for infringement and what Google must prove for invalidity.<br><br>Google's position: Resolution may impact validity and/or infringement, and may assist the jury. |

[13] IPA also points to claims 12-15, but those—and the vast majority of the patents' claims—were invalidated in IPRs.

### 1. IPA's Opening Position

"[W]hether to treat a preamble as a claim limitation is determined on the facts of each case in light of the claim as a whole and the invention described in the patent.'" *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 952 (Fed. Cir. 2006) (quoting *Storage Tech. Corp. v. Cisco Sys., Inc.*, 329 F.3d 823, 831 (Fed. Cir. 2003)). "Normally, a preamble is used to state a purpose or intended use for the invention and therefore is generally not limiting." *Nimbelink Corp. v. Digi Int'l Inc.*, Case No. 2024-2292, 2026 WL 492037, at *2 (Fed. Cir. Feb. 23, 2026). But a preamble may be limiting in some situations, for example, "if it recites additional structure or steps the specification underscores as important, provides antecedent basis for a claim limitation, or serves as a basis for distinguishing prior art during prosecution." *Id.* Here, the Court should find the preambles of the asserted claims not to be limiting.

First, the preamble of claim 1 of the '115 patent recites a method for "communication and cooperative task completion." Similarly, claim 22 of the '128 patent recites in its preamble a computer program "executable to facilitate cooperative task completion within a distributed computer environment." The preambles of claims 50 and 53 of the '560 patent also recite "cooperative task completion within a distributed computer environment."

The claims do not rely on the phrase "cooperative task completion" as an antecedent basis for other claim limitations. *See Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002) ("dependence on a particular disputed preamble phrase for antecedent basis may limit claim scope because it indicates a reliance on … the preamble."). Moreover, deletion of the phrase "cooperative task completion" would not affect the bodies of the asserted claims, which are structurally complete. *Id.* at 810 ("[D]eletion of the disputed phrase from the preamble of Claim 1 does not affect the structural definition or operation of the terminal itself. The claim body defines

a structurally complete invention."). Accordingly, the claims that recite "cooperative task completion" in the preamble should not be deemed limited by that language.

In addition, "cooperative task completion" identifies a benefit of the claims. *Id.* at 809 ("[P]reamble language merely extolling benefits or features of the claimed invention does not limit the claim scope without clear reliance on those benefits or features as patentably significant."). As stated in the specification, the inventive architecture "*supports* cooperative task completion." (Ex. A, 4:60-63.) Indeed, a goal of the invention is to provide the framework for structuring cooperative interactions, which is a benefit of the invention, not a structure. (*Id.*, 9:12-17.) Cooperative interactions are therefore the end result of the patented invention; they are not themselves a structure.

Second, the Court should construe the phrase "dynamically expandable" from the preamble of claim 53 of the '560 patent as non-limiting. This term modifies the claimed ICL, which is mentioned in the preamble and described in greater detail in the claim limitations. In contrast, the phrase "dynamically expandable" is not referenced in the body of claim 53 or any claim that depends from it. It was not used as a basis for distinguishing the claim during prosecution. And the specification expressly identifies a "dynamically expandable" ICL as a "feature" of the invention. (Ex. A, 8:40-44.) This shows that the "dynamically expandable" of the preamble adds nothing structural to the claim that is not already captured in the body of the claim, and it is therefore not limiting. *Nimbelink*, 2026 WL 492037, at *3 ("We have long held that preamble language that merely extolls the benefits or features of the claimed invention does not limit claim scope.").

Finally, the Court should find the "mobile, ambient computer environment" phrase from the preamble of claim 22 of the '128 patent to be non-limiting. The preamble of the claim provides

that the method is "*for* providing a mobile, ambient computer environment" which indicates that this is the purpose of the method—a beneficial result of the claim—not a structural requirement. *See TomTom, Inc. v. Adolph*, 790 F.3d 1315, 1324 (Fed. Cir. 2015) (finding a portion of a preamble non-limiting when it employed "the standard pattern of such language: the words "a method for a purpose or intended use comprising," followed by the body of the claim, in which the claim limitations describing the invention are recited."). In addition, claim 22 and its dependent claims recite a complete invention when this phrase is deleted from the preamble, and the patentee did not rely on this phrase during prosecution. *See Nimbelink*, 2026 WL 492037, at *2.

The Court should therefore find that at least the above-referenced parts of the preambles are non-limiting.

**2. Google's Answering Position**

IPA concedes that the preambles are limiting except for three "specified portions." Notably, every preamble is at least partially limiting, as none comprises only those three portions.

Those three portions are also limiting. ***First***, IPA's position on "cooperative task completion" is incompatible with its previous representations to this Court. Specifically, in *IPA/Amazon*, IPA construed "cooperative task completion," in the preambles of claims 1 and 29 of the '115 patent and claims 50 and 53 of the '560 patent, as "[t]wo or more agents working together to complete a task/base goal," arguing this limiting construction "comports with the intrinsic record" and reflected "the vital role of the facilitator in the patented invention," and that any "attempt to read the facilitator out of the patented invention's 'cooperative task completion' should be rejected." *IPA/Amazon*, D.I. 118 at 12, 15–16. The Court construed "cooperative task completion" as plain meaning (*i.e.*, limiting) as a result. *IPA/Amazon*, D.I. 129 at 49. Google agrees "cooperative task completion" is limiting. It is not merely a benefit, as IPA now argues, but rather gives meaning and vitality to the claims. *See Pitney Bowes, Inc. v. Hewlett–Packard*

*Co.*, 182 F.3d 1298, 1305 (Fed. Cir. 1999) ("if the claim preamble is 'necessary to give life, meaning, and vitality' to the claim, then the claim preamble should be construed" as limiting). IPA itself has emphasized the language's "vital" nature and the specification makes clear that it is not merely a benefit but the point of the invention. *See, e.g.*, '115 patent, Abstract ("cooperative task completion by flexible and autonomous electronic agents"). Contrary to IPA's argument, a preamble need not provide antecedent basis to be limiting. *See Pitney Bowes*, 182 F.3d at 1305-06.

***Second***, "dynamically expandable," of claim 53 of the '560 patent, is antecedent basis for limitations and is therefore limiting. "[T]he preamble constitutes a limitation when the claim(s) depend on it for antecedent basis." *C.W. Zumbiel Co. v. Kappos*, 702 F.3d 1371, 1385 (Fed. Cir. 2012). Here, "dynamically expandable" modifies "ICL" in the preamble, which is the antecedent basis for "the ICL" recited repeatedly in the claim. The claim's use of "dynamically expandable" does not simply extol some relative or aspirational benefit. *See, e.g.*, *Nimbelink Corp. v. Digi Int'l Inc.*, 2026 WL 492037, at *3 (Fed. Cir. Feb. 23, 2026) (finding "space-efficient" non-limiting). Rather, the term here is concrete and categorical—the ICL is either "dynamically expandable" or not, and the claim's use of the term to directly modify the ICL confirms both that the ICL is "dynamically expandable" and that the term is limiting. The specification passage cited by IPA reinforces this, stating that the patents' ICL is dynamically expandable, not that it might be or that this is some aspirational benefit.

***Third***, "mobile, ambient computer environment" breathes life into the limitations of claim 22 of the '128 patent, such as "requests presented in … mobile input types" and "location agent." *See Pitney Bowes*, 182 F.3d at 1305. The '128 patent is directed to an application of the purported invention in a mobile context: "In particular, the present invention teaches a variety of software-

based architectures for communication and cooperation among distributed electronic agents to incorporate elements … into a highly mobile computing environment." '128 patent, 1:20-27; *see also id.*, 30:7-21 ("The present invention addresses the highly mobile computing environment…"). Accordingly, the limitation breathes life into and provides important context for the "mobile input types" and "location agent" limitations, and is therefore limiting. *See Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002).

**3. IPA's Reply Position**

Normally, preambles are not limiting. *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 952 (Fed. Cir. 2006). Exceptions apply when claim limitations provide important structure, an antecedent basis, or were used to distinguish prior art. *Nimbelink Corp. v. Digi Int'l Inc.*, No. 2024-2292, 2026 WL 492037, at *2 (Fed. Cir. Feb. 23, 2026). Google's response fails to identify any reason to deviate from the general rule.

Regarding "cooperative task completion," Google failed to refute IPA's argument that the phrase could be deleted without impacting the claim meaning, which demonstrates that the limitation provides no important structure. Nor did Google argue that the limitation provides an antecedent basis. Nor was the phrase used to distinguish prior art, which Google does not dispute.

Google argues generically that "cooperative task completion" is necessary to give life to the claims. But a vague reference to "life, meaning, and vitality" does not justify deviating from the general principle that preambles are not limiting.

Google also argues that IPA's position conflicts with IPA's positions in *Amazon*. But there was no argument in *Amazon* about whether a preamble was limiting. (*See* Case 1:16-cv-1266, D.I. 118, 12-18.) And, in contrast to the present dispute, which ***only*** involves preambles, the dispute in *Amazon* involved terms in the body of a claim. (*Id.* at 12 (referencing claims 1 and 45 of the '128 Patent).)

Next, Google incorrectly asserts the term "dynamically expandable" provides an antecedent basis in claim 53 of the '560 Patent. But "dynamically expandable" never appears in the claim body. And "dynamically expandable" does not provide an antecedent basis for the term "ICL" merely because it modifies the "ICL" in the preamble. "A preamble that is limiting in part does not transform nearby descriptive words … into claim limitations." *Nimbelink*, 2026 WL 492037, at *2-3. Further, the specification refers to the term "dynamically expandable" as a feature of the claimed invention. Google cannot hide from the precedent that "preamble language that merely extolls the benefits or features of the claimed invention does not limit claim scope." *Id.* at *3.

Finally, Google argues that "mobile, ambient computing environment" adds context to limitations like "mobile input types" and "location agents." However, "mobile, ambient computing environment" is a non-limiting descriptive name for these limitations in the body of the claim. *See IMS Tech., Inc. v. Haas Automation, Inc.*, 206 F.3d 1422, 1434 (Fed. Cir. 2000) (descriptive names in the preamble for limitations set forth in the claim body are not limiting).

### 4. Google's Sur-Reply Position

The parties agree preambles are limiting when they "provide important structure, an antecedent basis, or were used to distinguish prior art." *See supra* at 20. IPA concedes this standard is satisfied, agreeing the preambles here are limiting except for three "[s]pecified portions." *Supra* at 15. But IPA cannot explain how a POSITA would conclude the preambles are limiting but carve out these three phrases.

For "cooperative task completion," IPA itself agreed to a limiting construction of the term in the joint chart here and in *IPA/Microsoft*. *See* D.I. 117 at 17; *supra* at 18-19. As IPA concedes, the term is limiting, not a mere benefit, as confirmed by the intrinsic record. *See supra* at 18-19.

For "dynamically expandable," IPA's reliance on *Nimbelink* is misplaced. There, the term "space-efficient" (found non-limiting) modified "cellular modem device," a device nowhere in the claim's body. 2026 WL 492037, at *3. Here, "dynamically expandable" modifies "ICL," a term recited throughout the claims.

IPA's argument that "mobile, ambient computing environment" is merely a "descriptive name" fails. *Supra* at 21. The '128 patent is a continuation-in-part filed to specifically add mobile computing. *See* '128 patent, 30:12-13 ("The present invention addresses the highly mobile computing environment…"). The term breathes life into the claims and provides crucial context.

**C. Order of Steps**

| IPA's Construction | Google's Construction | Why Resolution Matters |
|---|---|---|
| This issue only applies to the asserted method claims, not the asserted apparatus claims.<br><br>Steps in method claims need not be performed in the order written. | This issue applies to all asserted claims.<br><br>All steps of all claims must be performed in the order written. | IPA's position: Rather than proffer a true construction for these phrases, Google seeks to append an additional limitation. This is therefore a non-infringement position disguised as a request for claim construction.<br><br>Google's position: Resolution may impact validity and/or infringement, and may assist the jury. |

**1. IPA's Opening Position**

"Although a method claim necessarily recites the steps of the method in a particular order, as a general rule the claim is not limited to performance of the steps in the order recited, unless the claim explicitly or implicitly requires a specific order." *Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1345 (Fed. Cir. 2008) (citing *Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1342-43 (Fed. Cir. 2001)). The Federal Circuit has provided a two-part test to determine if a claimed method must be performed in the order in which the steps are listed even

when the claim recites no order. *See Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1369 (Fed. Cir. 2003). First, a court must look to the claim language to determine whether the steps must be performed in the order written "as a matter of logic or grammar." *Id*. This can occur when an earlier step generates a result or product referenced in a later step. *See, e.g., Mantech Env't Corp. v. Hudson Env't Servs., Inc.*, 152 F.3d 1368, 1375-76 (Fed. Cir. 1998). Further, if the claim language does not indicate that the steps are to be performed in written order, a court must "look to the rest of the specification to determine whether it 'directly or implicitly requires such a narrow construction.'" *Altiris*, 318 F.3d at 1370 (citing *Interactive Gift,* 256 F.3d at 1343). If the intrinsic record does not require the narrow construction, courts should not impose a sequential requirement on the method. *Altiris*, 318 F.3d at 1370.

The asserted method claims here do not explicitly or implicitly require a particular order of the steps. For example, claim 1 of the '115 patent gives no indication that the program must register a description of each active client agent's functional capabilities before receiving and interpreting the service request, even though that is the order in which these steps are recited. A service request could be received and interpreted before the program registers agent capabilities, or that these steps could happen at the same time.[14] In addition, the "act of interpreting" step recites the sub-steps "generating one or more sub-goals" and "constructing a goal satisfaction plan," in that order. But nothing in the claim language indicates, either logically or grammatically, that the sub-goals must be generated before the goal satisfaction plan is constructed—the sub-steps could take place in the order they are written, in the reverse order, or at the same time, and the method would achieve the same result. *See Hand Held Prods., Inc. v. Amazon.com, Inc.*, C.A. No. 12-cv-

[14] This also holds true for claim 22 of the '128 patent, which similarly recites "registering one or more capabilities for each of the electronic agents" before "receiving one or more user input requests."

768-RGA-MPT, 2014 WL 2873902, at *7 (D. Del. June 24, 2014) (adopting R&R at 2014 WL 5779416) ("Because Amazon has not submitted evidence from one of skill in the art explaining why the 'determining' and 'decoding' steps can not take place concurrently, the court declines to deviate from the 'general rule the claim is not limited to performance of the steps in the order recited' with regard to those two steps."). Similarly, claim 50 of the '560 patent recites "providing a plurality of synchronized agent registries" before "interpreting a service request." There is again no indication that these steps cannot happen in reverse, or at the same time.

The specification is instructive on this point. For example, Figure 11 shows an iterative process whereby the goal satisfaction plan is constructed and implemented, and if the system determines that the original goal has not been completed, the process starts over again. (Ex. A, 18:50-52.) The iterative nature of this process is implicit in the asserted claims, given that the aim of the system is ultimately to achieve the base goal, but the iteration is not set forth in a specific order of steps in most of the claims. Additionally, in describing the embodiment of Figure 11, the specification states "[i]t should be noted that the actual implementation of steps 1112 and 1114 are dependent upon the specific goal satisfaction plan. For instance, certain sub-goals may be sent to separate agents in parallel, while transmission of other sub-goals may be postponed until receipt of particular answers. Further, certain requests may generate multiple responses that generate additional sub-goals." (*Id.*, 18:41-48.) This language supports an embodiment that is not always linear, as the claim language is written, but flexible and capable of changing course.

Overall, the intrinsic record does not support the narrow construction that the steps must be performed in the order written, either as a matter of logic or grammar. *See Altiris*, 318 F.3d at 1370-71 ("In the case before us, nothing in the intrinsic evidence indicates that the 'setting' step must be performed before the 'booting normally' step. . . . Nowhere, however, is there any

statement that this order is important, any disclaimer of any other order of steps, or any prosecution history indicating a surrender of any other order of steps."); *Baldwin Graphic Sys.*, 512 F.3d at 1345 ("In this case, the claims themselves contain no basis to require air content reduction before winding. Though the claims, specification, and prosecution history require that the air content of the cleaning fabric be reduced prior to saturation, this does not mean that the air content must be reduced prior to winding on the roll."); *Xerox Corp. v. Google Inc.*, 801 F. Supp. 2d 293, 302-303 (D. Del. 2011) ("The claims contain no basis to require that the 'formulating the query' step begin only after the 'identifying' and 'categorizing' steps are completed or that the 'adding terms' step (of claims 2 and 19) occur only after completion of the 'formulating' step.").

### 2. Google's Answering Position

Under *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363 (Fed. Cir. 2003), the claim language compels the written order as a matter of logic and grammar, and the prosecution histories and specifications confirm it. IPA's arguments fail, and none of its cited authorities requires a different result.

#### a. The Claim Language Requires That The Steps Be Performed In The Order Written

As IPA recognizes, courts first look to "the claim language to determine whether the steps must be performed in the order written 'as a matter of logic or grammar.'" *Supra* at 23. The steps here logically and grammatically reference language from previous steps, so they must be performed in order.

Claims 50 and 53 of the '560 patent, claims 1 and 29[15] of the '115 patent, and claim 22 of the '128 patent follow the same steps in the same structured order: (Step 1) start with a distributed

[15] Claim 29 recites a "computer program comprising computer executable instructions for…" then lists the same steps found in the method claims, particularly claim 50 of the '560 patent. Claim 29 therefore must be construed consistently with the related method claims. *See Sci.*

computing environment of autonomous agents, (Step 2) provide a registry of agents, (Step 3) interpret a service request to determine a base goal, (Step 4) determine a goal satisfaction plan to complete the base goal determined in Step 3, and (Step 5) implement the goal satisfaction plan using the registered agents introduced in Step 2.

For Step 1, the preamble introduces the "distributed computing environment including a plurality of autonomous electronic agents." '560 patent, cl. 50; '115 patent, cl. 29; s*ee also* '128 patent, cl. 22; '115 patent, cl. 1. Step 2—"providing a plurality of synchronized agent registries each declaring capabilities of service-providing electronic agents currently active within the distributed computing environment"—references the agents and the environment from the preamble. '560 patent, cl. 50; *see also* '115 patent, cl. 29; '128 patent, cl. 22, '115 patent, cl. 1.

Step 3 requires "interpreting a service request in order to determine a base goal," and Step 4 recites constructing "a base goal satisfaction plan" for the base goal determined in Step 3. '560 patent, cl. 50; '115 patent, cl. 29; *see also* '128 patent, cl. 22; '115 patent, cl. 1. The chain of antecedent references is explicit and unbroken: the program cannot construct a plan to satisfy "the base goal" until it determines that base goal, and cannot "implement" the plan until it constructs that plan. '560 patent, cl. 50; '115 patent, cl. 29. Each definite article refers to an element of an earlier step. *See Hytera Commc'ns Co. v. Motorola Sols., Inc.*, 841 F. App'x 210, 218 (Fed. Cir. 2021) (requiring order where "each step of the method provides an antecedent basis for the steps that follow"); *Sound View Innovations, LLC v. Hulu, LLC*, 166 F.4th 958, 967 (Fed. Cir. 2026)

---

*Applications Int'l Corp. v. United States*, 2024 WL 874199 (Fed. Cl. Feb. 14, 2024) ("To…imply the ordering analysis should apply to method claim 15 but not [system claim] 1 and [computer-readable medium claim] 29, when all three claims share the identical method steps embedded in their language, would lead to an unreasonable and illogical result.").

("implicit ordering exists when there are inherent logical dependencies or functional relationships between the recited steps").

**b. The Intrinsic Record Confirms The Required Order**

Although the Court need not look beyond the claim language, the intrinsic record confirms the steps must be performed in order. *See Altiris*, 318 F.3d at 1370. During prosecution, IPA relied on the order to distinguish prior art: "In contrast [to the KISS reference], the facilitator of Claim 1 cannot begin execution of the goal satisfaction plan before the goal satisfaction plan is complete." Ex. A-3 at 132. This is exactly the "disclaimer of any other order of steps" which confirms the written sequencing. *See Altiris*, 318 F.3d at 1371 (cleaned up).

The description of Figure 11 likewise describes an ordered sequence:

> ***The start*** of such operations in step **1100** ***leads to*** the reception of a goal request in a step **1102** by the facilitator. This request is ***then*** parsed and interpreted by the facilitator in a step **1104**. The facilitator ***then proceeds*** to construct a goal satisfaction plan in a next step **1106**. In steps **1108** and **1110**, respectively, the facilitator determines the required sub-goals and ***then*** selects agents suitable for performing the required sub-goals. The facilitator ***then*** transmits the sub-goal requests to the selected agents in a step **1112** and receives the results of these transmitted requests in a step **1114**…. ***Once the responses have been received***, the facilitator determines whether the original requested goal has been completed in a step **1118**.... .

'115 patent, 18:56-19:13.

**c. IPA's Arguments and Authorities Do Not Compel A Different Result**

IPA points to claim 1 of the '115 patent, which generally follows the same five-step order, to argue the agent-registry step need not precede interpretation of the service request. But as IPA previously admitted, the agent registry is a prerequisite to "a suitable delegation of sub-goal requests" within "constructing a goal satisfaction plan." *See IPA/Amazon*, D.I. 129 at 11 ("[T]he way that a facilitator agent knows which agents are capable of performing which sub-goals, that's

accomplished through the use of a agent registry."). In claim 1, constructing a goal satisfaction plan includes a suitable delegation of sub-goal requests. Without an agent registry, the program cannot determine what capabilities are available to make the delegation. The agent registry must exist before such delegation.

IPA next cites to the disclosure that "the facilitator recursively repeats the operations 1106 through 1116" to argue that the steps are not ordered because "iteration is not set forth in a specific order of steps in most of the claims." *Supra* at 24. IPA misses the point. IPA's own description of "iterative" concedes that the underlying steps are ordered; it cannot characterize the method as a repeating sequence while denying that the claim steps are sequenced. Indeed, IPA relies on Figure 11, which makes explicit that the steps are performed in a sequence.

IPA's citation to the specification's statement that "the actual implementation of steps 1112 and 1114 are dependent upon the specific goal satisfaction plan" also misses the point, as it only addresses the internal implementation of a single limitation (specifically, the final step of "implementing the goal satisfaction plan"), not the relative ordering of the claim as a whole.

IPA's cited authorities are inapposite. In each, the claims contained steps without sequential limitations or antecedent dependencies. *See supra* at 24-25. Here, each step supplies grammatical and logical antecedents for the next, which is exactly when the claim steps must be in the written order. *See Altiris*, 318 F.3d at 1369. The claim language and intrinsic evidence require that the steps be performed in order.

### 3. IPA's Reply Position

At the outset, Google's initial term exchange only sought the Court's guidance on whether the steps of the asserted ***method claims*** must be performed in the order they are written. Google never previously indicated that it wished to include the asserted apparatus claims (claim 29 of the '115 Patent and its associated dependent claims) in this bucket. (*See* D.I. 117, at 9 (category titled

"Method claims").) Yet, in its Answering Brief, Google unilaterally changed the category from "Method claims" to "Order of steps" to ensure inclusion of apparatus claims. IPA does not agree to this change.

Regardless, Google's only cited case to support this change is an opinion from the Court of Federal Claims that is not binding on this Court. And Google's cited language comes from a footnote that begins, "[t]his Court is not aware of, nor have the parties identified, any Federal Circuit precedent establishing a per se rule that system claims may not be construed to require an order." *Sci. Applications Int'l Corp. v. United States*, 169 Fed. Cl. 643, 699 n.64 (2024). Accordingly, Google's assertion that "Claim 29 ***must*** be construed consistently with the related method claims," *i.e.*, bound to a sequential order, is unsupported by *Sci. Applications.* or any other authority. The Court should continue to analyze only the asserted method claims (and not claim 29).[16]

As to the method claims, IPA does not dispute that certain claim elements containing antecedent references should be performed in the order written. For example, "determining a goal satisfaction plan" must occur before "implementing the base goal satisfaction plan." (Ex. B, cl. 50.) But having some claim elements with antecedent language does not support a conclusion that ***all*** elements, even those that do not include antecedent language, must be bound to a strict ordering. For example, the "act of interpreting" step of claim 1 of the '115 Patent recites the sub-steps "generating one or more sub-goals" and "constructing a goal satisfaction plan," in that order. Nothing in the claim language indicates, however, that the sub-goals must be generated before the

[16] The Court should also ignore the sequential notations Google added to the claim language. None of the asserted method claims number the steps or indicate that the steps must be performed in a sequential order. By appending the notations "(Step 1)," "(Step 2)," etc. to each of the method steps, Google misleadingly indicates that the claims themselves contain this language.

goal satisfaction plan is constructed—the sub-steps could take place in the order they are written, in the reverse order, or at the same time, and the method would achieve the same result.[17]

Finally, Figure 11 shows an embodiment that describes a sequential order of steps. (Ex. A, 18:29-31.) That a single embodiment describes an order of steps does not mean that the claim language itself is limited to that order. *See Phillips*, 415 F.3d at 1323 ("although the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments.").

#### 4. Google's Sur-Reply Position

After first proclaiming the claims require no sequencing, IPA now concedes "certain claim elements containing antecedent references should be performed in the order written." *Supra* at 29. This gives up the game, as the *same* antecedent-basis structure pervades the claims. *See supra* at 25-27.

The claims' logic also compels a sequence: the system cannot construct a plan to satisfy "the base goal" until it determines what that base goal is, and cannot "implement" the plan until it is constructed. Nor can it delegate sub-goals to capable agents until the agents' capabilities are registered and known. *See Sound View*, 166 F.4th at 967 ("ordering exists when there are inherent logical dependencies"). IPA's argument that claim 1's goal-satisfaction plan could be constructed *before* identifying sub-goals contradicts the claim's very next line, which states that plan includes "***a suitable delegation of sub-goal[s]***." '115 patent, 29:32-36. Sub-goals cannot be "suitabl[y]" delegated without first being identified. The prosecution history further confirms the required order. *See supra* at 27.

[17] Google's citation to the file history does not compel a different overall result. That IPA argued that "the facilitator of Claim 1 cannot begin execution of the goal satisfaction plan before the goal satisfaction plan is complete" does not indicate a disclaimer of any other order of steps ***for all other claim elements***, only for those two elements of Claim 1.

IPA's objection to Google's including claim 29's computer-program implemented steps as requiring a sequence is unfounded. *Supra* at 28-29. IPA seeks to dismiss *Sci. Applications*, 169 Fed. Cl. 643, as a non-binding outlier, *supra* at 29 , but ignores that this Court addressed the same issue months later. In *Corrigent Corp. v. Dell Techs. Inc.*, C.A. No. 22-496, 2024 WL 2747047, at *11 n13 (D. Del. May 29, 2024), the Court imposed ordering on apparatus claims containing similar limitations to method claims, noting "multiple district courts have imposed such orders."

The Federal Circuit has likewise applied sequencing to non-method claims. *See Oak Tech., Inc. v. Int'l Trade Comm'n*, 248 F.3d 1316, 1325 (Fed. Cir. 2001) (disk-drive-controller claim required "a sequential process"); *see also Altiris*, 318 F.3d at 1369-71 (analyzing ordering in method claim 1 and system claim 8 together).

IPA does not and cannot distinguish claim 29's steps from those of the method claims. Claim 29 recites the same five general steps as the other claims. *See supra* at 25-27 & n.15. IPA offers no authority for construing such similar terms inconsistently across claims. *But see SightSound Techs., LLC v. Apple Inc.*, 809 F.3d 1307, 1316 (Fed. Cir. 2015).

### D. "registering a description of each active client agent's functional capabilities as corresponding registered functional capabilities" / "registering the specific

**agent together with the new agent profile within the agent registry" / "registering one or more capabilities for each of the electronic agents"**

| IPA's Construction | Google's Construction | Why Resolution Matters |
|---|---|---|
| No construction necessary.<br><br>IPA also does not agree that these three phrases should be given a single construction. If the Court finds construction is necessary, IPA asks (1) the three phrases be considered separately and (2) the Court give each of these phrases their plain and ordinary meaning. | "registering a description of [each active client agent's / the specific agent's] functional capabilities, transmitted to the facilitator by [each agent / the specific agent], as corresponding registered functional capabilities" | IPA's position: Rather than proffer a true construction for these phrases, Google seeks to append an additional limitation. This is therefore a non-infringement position disguised as a request for claim construction.<br><br>Google's position: Resolution may impact validity and/or infringement, and may assist the jury. |

**1. IPA's Opening Position**

The Court construed the phrase "agent registry" in the Amazon case to have its plain and ordinary meaning (Case No. 1:16-cv-1266, D.I. 128, at 2) and adopted that construction again in the Microsoft case. (Case No. 1:18-cv-1, D.I. 143, at 5.) The Court also adopted the parties' agreed construction of "capability" in the Microsoft case to mean "a function an agent can perform" (Case No. 1:18-cv-1, D.I. 143, at 4), and the parties have agreed to that construction here. Furthermore, in this case, Google requests the Court construe the term "active client agent." Given this history, there is no need for further construction of these phrases as a whole. This is especially true given that Google's proposed construction repeats language found verbatim in claim 1 of the '115 patent and just adds the phrase "transmitted to the facilitator by each active agent," functionally rewriting the claims without providing additional clarity as to the meaning of the subject phrases.

If the Court chooses to construe these phrases, they should be construed separately because the three phrases contain meaningfully different language. For example, claim 1 of the '115 patent recites registering a "description" of "functional capabilities" while claim 30 of the '115 patent

recites registering "the new agent profile" and claim 22 of the '128 patent recites registering more general "capabilities." It does not make sense to group these three phrases for construction when the only "construction" Google seeks is the addition of a separate limitation. *See Karlin Tech. Inc. v. Surgical Dynamics, Inc.*, 177 F.3d 968, 971-72 (Fed. Cir. 1999) ("[D]ifferent words or phrases used in separate claims are presumed to indicate that the claims have different meanings and scope.")

Whether the Court considers these three phrases separately or as a whole, the Court should give them their plain and ordinary meaning. Plain and ordinary meaning is always "the default in claim construction." *CFL Techs. LLC v. Osram Sylvania, Inc.*, C.A. No. 18-cv-1445-RGA, 2022 WL 606329, at *11 (D. Del. Jan. 21, 2022). Here, the plain and ordinary meaning of these phrases would derive from the Court's prior two orders construing "agent registry" as having its plain and ordinary meaning; the agreed-to construction of "capability"; the Court's new construction of "active client agent"; and the plain and ordinary meaning of such straightforward terms as "registering," "description," and "agent." *See Phillips*, 415 F.3d at 1314 ("In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words.").

**2. Google's Answering Position**

The parties' core dispute is whether registering an agent requires the transmission of an agent's capabilities to a facilitator. Google's construction requires such transmission; IPA proposes no construction, such that registering an agent does not necessarily involve either a facilitator or an agent. IPA's argument is illogical and contradicts: (1) IPA's prior successful arguments about the facilitator's central role in registration; (2) the specification's emphasis of the facilitator in registration in the "present invention"; and (3) the specification's repeated and

consistent description of registration by an agent transmitting its capabilities to a facilitator. Each warrants adoption of Google's construction.

**a. In *IPA/Amazon*, IPA successfully argued that the facilitator is "vital" to registering agents' capabilities in "the patented invention"**

In *IPA/Amazon*, IPA asserted that the facilitator had a role in registering agents. There, the parties disputed the construction of "agent registry." Amazon argued that agents had to register themselves with a facilitator. IPA argued this was too limiting because a facilitator could also register an agent based on the capabilities the agent provided to the facilitator.[18] Notably, no party ever disputed that registering an agent required a facilitator to receive the agent's capabilities—exactly what Google proposes. Nor could they, given the claim language and the patents' unambiguous disclosures.

Indeed, IPA argued a plain-and-ordinary-meaning construction of "agent registry" in *IPA/Amazon* by emphasizing that registering an agent involves an agent transmitting its capabilities to the facilitator. Specifically, IPA emphasized "the vital role of the facilitator in the patented invention," explaining "the specification provides that an agent registers its capabilities with the facilitator, meaning ***the facilitator subsequently enters those capabilities within the registry***." *IPA/Amazon*, D.I. 118 at 15, 62. Based on IPA's argument, the Court rejected Amazon's proposal that agents must register themselves, as a facilitator could also register agents by recording the capabilities agents transmitted. *IPA/Amazon*, D.I. 128 at 2. Now, IPA departs from its argument in *IPA/Amazon* and asserts that the claimed "registering" an agent need not involve a facilitator.

---

[18] *IPA/Amazon*, D.I. 118 at 64 ("[T]he only remaining issue in dispute is whether, as Amazon argues, agents must register … or, as IPA argues, agent capabilities can also be registered … by a facilitator.").

**b. The Specification Ties Registering Agent Capabilities Transmitted to The Facilitator To The "Present Invention" and Its Stated Purpose**

IPA's current position cannot be squared with the patents' repeated and unambiguous disclosures. The specification makes clear that the facilitator is inseparable from the invention, the registry, and the registration process—and is not a mere preferred embodiment. "The only meaning that matters in claim construction is the meaning in the context of the patent." *Trs. of Columbia Univ. v. Symantec Corp.*, 811 F.3d 1359, 1363 (Fed. Cir. 2016). Indeed, the specification ties the facilitator's role in registering agents' capabilities to the patents' "present invention": "***[t]he facilitator of the present invention*** maintains a knowledge base that records the capabilities of a collection of agents." '115 patent, 16:43-46. Whether the agents register themselves or facilitators register agents, agents' capabilities must be "transmitted to the facilitator" for the facilitator to have knowledge of those capabilities. Because the specification ties the facilitator's involvement in registering agents to the "present invention," IPA's attempt to divorce such registration from a facilitator or agent is improper. *See Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1372 (Fed. Cir. 2014) ("[D]isclaimer applies when the patentee makes statements such as 'the present invention requires...' or 'the present invention is...' …").

The specification further teaches that the facilitator's registering agents' capabilities enables the patents' core purpose, namely, mediating cooperation among a community of agents: "In particular, ***the present invention teaches*** a variety of software-based architectures for ***communication and cooperation*** among distributed electronic agents." '115 patent, 1:27-29. "[A] patent's express purpose of the invention 'informs the proper construction of claim terms.'" *Sequoia Tech., LLC v. Dell, Inc.*, 66 F.4th 1317, 1326 (Fed. Cir. 2023). The patents teach that agents "***necessitate[] greater flexibility*** in interactions within communities of agents," which is ***"achieved through*** an architecture organized around ***the declaration of capabilities by service-***

***providing agents*** … ***and the role of facilitators*** in delegating and coordinating the satisfaction of these goals…." '115 patent, 5:3-8, 9:9-11. The facilitator brokers "communication and cooperation among the agents" and achieves "cooperative task completion" through "its up-to-date knowledge about the current membership of a dynamic community." '115 patent, 19:52-60. To cooperatively complete tasks, the specification teaches that the facilitator is core to delegating sub-goals to service agents based on their registered capabilities. Thus, the specification expressly ties the facilitator registering agents' capabilities to the invention's purpose. IPA's current suggestion that the "registering" limitations should be construed to not require either the facilitator or agents is unfounded. Tellingly, IPA identifies no other way for registration to occur.

#### c. The Specification Repeatedly and Consistently Describes Registration as Involving Transmission of an Agent's Capabilities to a Facilitator

The specification makes clear that registration requires transmitting an agent's capabilities to a facilitator. Indeed, the specification does not enable registration in any other way—for example, it does not contemplate how a facilitator could independently discover agents' capabilities, nor how agents could discover each other's capabilities and IPA does not suggest any other way. Rather, the specification repeatedly and consistently discloses that the facilitator learns of agents' capabilities via transmissions from agents. "[W]hen a patent repeatedly and consistently characterizes a claim term in a particular way, it is proper to construe the claim term in accordance with that characterization." *GPNE Corp. v. Apple Inc.*, 830 F.3d 1365, 1370 (Fed. Cir. 2016). Such is the case here, as highlighted by the following examples.

***First***, Figure 8 depicts "Agent Registration" as including a "Client Agent Transmits Profile To Facilitator" step followed immediately by a "Facilitator Registers Client Agent" step. '115 patent, Fig. 8 (steps 808, 810).




Fig. 8

***Second***, Figure 4 similarly illustrates transmission from an agent to its facilitator: "[u]pon connection, an agent registers with its parent facilitator a specification of [its] capabilities." '115 patent, 7:19-21. That is, the agent ***connects*** to the facilitator and then ***transmits its capabilities***.




Fig. 4

***Third***, as noted above, *supra* at 35-36, the specification emphasizes that registration entails the facilitator maintaining the agent capabilities provided to it and goes on to tie that to the purported benefits of the invention.

***Fourth***, the specification highlights that its goal of cooperation among agents relies upon "providers of services register[ing] capabilities specifications with a facilitator." '115 patent, 10:40–45. Indeed, the specification emphasizes the importance of an agent transmitting its capabilities to a facilitator: "every participating agent defines and ***publishes*** a set of capability declarations … [which are] ***used by a facilitator*** in communicating with the agent, and, most important, in delegating service requests (or parts of requests) to the agent." '115 patent, 12:2–9.

"As new agents connect to the facilitator, registering capability specifications…what the user can say and do dynamically changes…." '115 patent, 8:40–44.

In short, the specification repeatedly and consistently describes registering an agent as involving an agent transmitting its capabilities to a facilitator and emphasizes the importance of this to the alleged invention.

#### d. IPA's Arguments Are Unavailing and Ignore The Specification

IPA's argument that no construction is necessary ignores the specification, as detailed above. IPA is "not entitled to a claim construction divorced from the context of the written description and prosecution history." *Eon Corp. IP Holdings v. Silver Spring Networks*, 815 F.3d 1314, 1320 (Fed. Cir. 2016). IPA also argues that no construction is necessary because some terms contained within have agreed constructions, but that ignores the present dispute. "When the parties present a fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve it." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008).

Finally, IPA's assertion that the grouped claim terms have "meaningfully different language" is belied by the specification. For example, an agent's "profile" is no different from its "capabilities," as the specification uses those terms interchangeably. '115 patent, 7:19–25 (using "capabilities" and referring to Fig. 8 "[f]or more details"), 17:42-61 (using "profile" in describing Fig. 8). Similarly, "functional capabilities" is no more specific than "capabilities." The specification only contemplates capabilities that are functional. '115 patent, 7:40-42 (equating "[t]he ***functionality*** of each client agent" with "the client agent's ***capabilities***"). In accord, the parties have already agreed to construe "capability" as "a ***function*** an agent can perform." Because these claim terms capture the same concepts and do not, despite IPA's contention, contain meaningfully different language, they should be construed consistently.

### 3. IPA's Reply Position

First, claim 1 of the '115 Patent does not recite a facilitator, so a construction importing that limitation into claim 1 would be nonsensical. *See Becton*, 616 F.3d at 1255 ("facially nonsensical [constructions] cannot be correct."). Second, Google asks the Court to construe claims 1 and 30 of the '115 Patent the same even though claim 30 ***does*** recite a facilitator. This disregards the claim construction canon that different claim language is presumed to carry different scope. *See Forest Laboratories, Inc. v. Abbott Laboratories*, 239 F.3d 1305, 1310 (Fed. Cir. 2001).

Beyond requesting the Court violate the canon of claim differentiation, Google also seeks to import limitations from the specification into the claims. First, Google argues that IPA's position conflicts with its positions in *Amazon.* Google asserts that IPA previously argued that "registering an agent involves transmitting its capabilities to the facilitator." But IPA never argued that agent registration ***always*** involves transmitting capabilities to a facilitator. IPA only argued that "the facilitator ***can also*** register an agent." (Case 1:16-cv-1266, D.I. 118, at 62). In other words, "[IPA's] proposed construction [was] agnostic as to whether the capabilities are in the registry by the agent or the facilitator." (*Id.* at 63.) The Court agreed, finding the "agent registry" term was "agnostic, as to how the agents get registered there." (Ex. K, Amazon, May 14, 2020, hearing transcript, 120:11-18).

Google also misrepresents IPA's prior position about the "agent registry." Google stitches together quotes from arguments about different claim terms in *Amazon*, stating that "IPA emphasized 'the vital role of the facilitator in the patented invention,' explaining 'the specification provides that an agent registers its capabilities with the facilitator, meaning *the facilitator subsequently enters those capabilities within the registry*.'" However, Google combines two quotes taken from very different parts of the *Amazon* briefing. (*See* Case 1:16-cv-1266, D.I. 118, at 13, 15 (first quote) and *id.*, at 61-62 (second quote).) IPA has always maintained, both in *Amazon*

and here, that plain and ordinary meaning should apply, which is agnostic as to the involvement of a facilitator in the agent-registration process. Thus, IPA's past and current positions are consistent.

Google next argues that disclaimer should apply because the specification recites "[t]he facilitator of the present invention maintains a knowledge base that records the capabilities of a collection of agents." (quoting Ex. A, 16:43-46). However, the relevant paragraph discusses a preferred embodiment. (*Id.*, 16:39-43.) That paragraph also lacks an unambiguous disclaimer indicating that its invention "requires" registration with a facilitator agent or "is" registration with a facilitator agent. *See Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1372 (Fed. Cir. 2014). Further, even if the cited passage invoked a disclaimer, it would not support Google's construction because it discusses what information a facilitator maintains. It does not disclose how a facilitator receives information about agents. (Ex. A, 16:43-46.)

Google next argues that having a facilitator register agent capabilities relates to the asserted patent's "core purpose, namely cooperation among a community of agents." But Google's support comes from preferred embodiments and it fails to link agent registration to the patents' "core purpose." For example, Google cites a passage about "communication and cooperation among distributed electronic agents" but the passage never mentions agent registration by a facilitator. Regardless, that passage refers only to an embodiment. (Ex. A, 1:29-33.) ("[C]ertain embodiments teach … facilitation by a facilitator agent")

Google also cites a passage about "the role of facilitators." But this passage is framed as a description of a "first embodiment of the present invention." (Ex. A, 4:58-60.) And again, nothing in the passage mentions a connection between agent registration and a "core purpose" of the patent. (*Id.*, 4:58-5:16.)

Finally, Google argues that the specification fails to teach alternative ways to register an agent. That is an insufficient basis to read limitations into a claim: "Even when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using 'words or expressions of manifest exclusion or restriction.'" *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004). Google has not suggested there is a "clear intention" to disclaim this claim scope, not could it.

**4. Google's Sur-Reply Position**

IPA's reply does not dispute the transmitted-by-the-agent portion of Google's construction.

Regarding the facilitator in Google's construction, IPA's attempts to minimize the facilitator's central role in the invention and registration fail. For the specification's disclosures, IPA points to other parts of a "paragraph" or "passage," but the language cited by Google clearly and unmistakably limits "the present invention" by, for example, describing the facilitator as "of the present invention" (not just an embodiment) and that its core purpose is "achieved" in part via "the declaration of capabilities by service-providing agents … and the role of facilitators," *i.e.*, the claimed agent-registration process. '115 patent, 5:3-9, 16:43-46. IPA dismisses the specification's reference to "[t]he facilitator of the present invention" because it lacks the words "is" or "requires," but "[t]here are no magic words that must be used" to limit a claim. *Hill-Rom*, 755 F.3d at 1373. The specification limits all claims. IPA's argument that certain claims lack facilitators overlooks that all claims recite agent registries/registration—for which the patents emphasize the facilitator is integral—and claim 29 recites a program "to facilitate" task completion. *See supra* at 33-36. IPA's claim-differentiation argument also

ignores that claim 30 adds three steps—not just a facilitator—and cannot overcome the specification regardless. *See Seachange Int'l, Inc. v. C-COR, Inc.*, 413 F.3d 1361, 1369 (Fed. Cir. 2005) ("claim differentiation … will be overcome by a contrary construction dictated by the written description").

IPA's defense of its prior positions misses two key points. First, the import of IPA touting "the vital role of the facilitator" in *IPA/Amazon* is not cabined to one limitation. *Supra* at 40. On its face, the statement addressed "the patented invention," which includes the agent registry. Indeed, IPA's citation in support of the facilitator being "vital" points to the facilitator's "up-to-date knowledge" about the agent community (i.e., its agent registry). *IPA/Amazon*, D.I. 118, 15 (quoting '115 patent, 19:57-64). The statements are plainly relevant here. Second, IPA's proposing a plain-and-ordinary-meaning construction here and in *IPA/Amazon* does not make its positions consistent. In *IPA/Amazon*, IPA stressed that its plain-and-ordinary meaning included a facilitator whereas now it accuses Google of improperly importing the facilitator into the same term—those positions cannot be squared. See *supra* at 34.

As Google detailed, *supra* at 33-39, the specification defines the facilitator as intrinsic to the invention and "repeatedly and consistently" discloses that it learns agents' capabilities via transmissions from agents. This limits the claims. *See Hill-Rom*, 755 F.3d at 1373; *GPNE*, 830 F.3d at 1370.

### E. "providing an agent registry data structure" / "providing an agent registry that declares capabilities of service providing electronic agents currently active within the distributed computing environment" / "providing a plurality of synchronized agent registries each declaring capabilities of service-providing agents currently active within the distributed computing environment" / "providing a plurality of synchronized agent registries each

**declaring a set of functional capabilities for one or more of the autonomous service-providing electronic agents"**

| IPA's Construction | Google's Construction | Why Resolution Matters |
|---|---|---|
| No construction necessary.<br><br>IPA also does not agree that these four phrases should be given a single construction. If the Court finds construction is necessary, IPA asks (1) the four phrases be considered separately and (2) the Court give each of these phrases their plain and ordinary meaning. | "providing [an agent registry / a plurality of synchronized agent registries] that declare[s] capabilities of service-providing electronic agents, transmitted to the facilitator by the agents, currently active within the distributed computing environment" | IPA's position: Rather than proffer a true construction for these phrases, Google seeks to append an additional limitation. This is therefore a non-infringement position disguised as a request for claim construction.<br><br>Google's position: Resolution may impact validity and/or infringement, and may assist the jury. |

**1. IPA's Opening Position**

The Court has twice applied plain and ordinary meaning to the term "agent registry" / "registry of capabilities of the service-providing electronic agents" (Case No. 1:16-cv-1266, D.I. 128, at 2; Case No. 1:18-cv-1, D.I. 143, at 5) and previously construed the term "capability." (Case No. 1:18-cv-1, D.I. 143, at 4.) The remaining claim language comprises straightforward English terms that would be readily familiar and understood by jurors. The Court should adopt its prior constructions and, if necessary, apply plain and ordinary meaning to the longer phrases. *See Phillips*, 415 F.3d at 1314.

By not proposing any definitions for the terms in the above phrases, Google effectively concedes that plain and ordinary meaning is appropriate. Its proposed "construction" once again does nothing more than import language taken from other claim limitations. Not only is this importation improper, it also presupposes that the meaning of the disputed phrases is apparent from the claims themselves—if the disputed phrases required constructions, Google would have provided some.

If the Court chooses to construe these phrases, IPA requests the Court construe them separately because the phrases have different meanings depending on the surrounding claim language. For example, claim 29 of the '115 patent expressly recites an agent registry "that declares capabilities of service providing agents" whereas claim 5 of the '115 patent lacks that limitation. Claim 29 includes the limitation "currently active within the distributed computing environment." But this limitation is absent from both claim 5 of the '115 patent and claim 53 of the '560 patent. Google's approach violates the "common sense notion [of claim construction] that different words or phrases used in separate claims are presumed to indicate that the claims have different meanings and scope." *Karlin Tech.,* 177 F.3d at 971-72.

If the Court decides to give these separate phrases a single construction, then plain and ordinary meaning should govern. *See CFL Techs.*, 2022 WL 606329, at *11 (plain and ordinary meaning is always "the default in claim construction."). Here, the plain and ordinary meaning of these phrases would derive from the Court's prior two orders construing "agent registry" as having its plain and ordinary meaning; the agreed-to construction of "capability"; the Court's new construction of "agents currently active"; and the plain and ordinary meaning of such straightforward terms as "providing," "declaring," and "agent." *See Phillips*, 415 F.3d at 1314 ("In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words."). There is no reason to add an unrelated claim limitation to the constructions of such straightforward phrases.

### 2. Google's Answering Position

For the same reasons stated above for the "registering" terms, Google asks the Court to construe these "registry" terms to require capabilities that are "transmitted to the facilitator by the agents."

### 3. IPA's Reply Position

Google asks the Court to insert the concept of a "facilitator" into multiple claims even though ***none*** of the claims recites a "facilitator." The patentee chose not to add a "facilitator" to the disputed claims as it did for numerous other claims. (*See* claims 3, 22, 24, 25, 30, 48 of the '115 Patent; claims 1, and 26 of the '560 Patent; and claims 1, 22 and 45 of the '128 Patent.) Yet Google seeks to insert additional limitations, even though "[i]t is improper for a court to add 'extraneous' limitations to a claim." *Hoganas AB v. Dresser Indus., Inc.*, 9 F.3d 948, 950 (Fed. Cir. 1993).

### 4. Google's Sur-Reply Position

As with the "registering" terms, IPA disputes only the facilitator in Google's construction. For the same reasons as above, IPA's objection fails.

## F. "active client agent" / "active agent" / "agent currently active"

| IPA's Construction | Google's Construction | Why Resolution Matters |
|---|---|---|
| No construction necessary. If the Court determines construction is needed, then these terms should be construed to mean "agent that is available to receive requests" | "agent currently maintaining a communication link with the facilitator agent controlling the agent registry" | IPA's position: Rather than proffer a true construction for these terms, Google seeks to append an additional limitation. This is therefore a non-infringement position disguised as a request for claim construction.<br><br>Google's position: Resolution may impact validity and/or infringement, and may assist the jury. |

### 1. IPA's Opening Position

These terms are easily understood by laypersons in the context of the claim language and need no construction. If the Court chooses to construe them, it should find that "active client agent" / "active agent" / "agent currently active" mean "agent that is available to receive requests." This meaning is consistent with the claims of the '115 patent that link the availability or unavailability of an agent to the agent's status as active or inactive. For example, claim 4 of the '115 patent recites "deactivating a specific client agent **no longer available to provide services** by deleting the registration of the specific agent." This language equates inactive agents with agents that are unavailable to provide services. By inverse logic, active agents are agents that are "available." This meaning is further supported by claim 30 of the '115 patent, which recites an agent registry that declares capabilities of currently active service-providing agents and the act of registering an agent with an agent profile "make[s] available … the capabilities of the specific agent." Once again, the focus remains on the availability of the agent. Similarly, claim 32 of the '115 patent recites "removing a specific service-providing electronic agent from the registry **upon determining that the specific agent is no longer available** to provide services." The meaning of the disputed term is therefore informed by the language and context of the claims and IPA's proposed construction reflects that language and context. *See ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1090 (Fed. Cir. 2003).

Google's proposed construction, which, again, seeks to import unrelated limitations (e.g. requiring a facilitator agent) into the construction, should be rejected. To the extent any construction is necessary, the Court should adopt IPA's straightforward proposal that defines what an active agent actually is in the context of the asserted claims, not how it may function in one particular embodiment.

### 2. Google's Answering Position

Google's construction reflects (1) the claim language, which recites "active agents" being registered, and (2) the specification, which discloses that agents establish a "Communications Link" when they become active ('115 patent, Fig. 8). IPA proposes that "active" be construed to mean "available to receive requests" and that Google's inclusion of "communication link" is improper, but neither IPA nor the specification suggests how an agent could receive a request ***without*** the disclosed communication link.

The claims consistently use "active" to describe agents participating in the community by ***communicating*** with the facilitator. For example, '115 patent claim 29 recites, "providing an agent registry that declares capabilities of service-providing electronic ***agents currently active*** within the distributed computing environment," which enables "selecting … agents from the agent registry suitable for performing the determined sub-goals." Providing further context, dependent claim 30 recites, "providing an agent registry includes … ***establishing a bi-directional communication link between the specific agent and a facilitator agent controlling the agent registry***…."

The specification reinforces this usage, consistently describing agents that actively participate in the same way: "every ***participating*** agent defines and publishes a set of capability declarations … used by a ***facilitator*** in ***communicating*** with the agent, and, most important, in ***delegating*** service requests (or parts of requests) to the agent." '115 patent, 12:2–9. Participation begins by establishing a connection:

- "***Upon connection***, an agent registers with its parent facilitator…." *Id.*, 7:19-21.
- "Facilitator And New Client Agent ***Establish Communications Link***". *Id.*, Fig. 8.

- "[T]he new client and its parent facilitator ***establish a communications link*** in a step 806." *Id.*, 17:55-56.
- "***Connected to server***. Agents are now ***active***." *Id.*, Fig. 5.

The specification further describes active agents maintaining communication with their facilitator: "[A]n agent [may] add, remove, and modify its solvables … ***at any time after connecting to its facilitator***." *Id.*, 12:11–14.

Moreover, such participation via connection to the facilitator enables the purpose of the invention, which "'informs the proper construction of claim terms.'" *Sequoia Tech.*, 66 F.4th at 1326. Here, the core purpose is to "take advantage of the facilitator's expertise in delegation, and its ***up-to-date knowledge*** about the current membership of a dynamic community." '115 patent, 19:57-60. The sole way described for the facilitator to have such "up-to-date knowledge" to coordinate cooperation among agents is by an agent maintaining a communication link with the facilitator.

In contrast, IPA's argument is divorced from the intrinsic record. IPA argues that "active" agents in a registry are "unrelated" to "a facilitator." *Supra* at 47. But this is wrong—as explained above, the claims refer to "active" agents ***only*** in the context of registration and active participation in the community. As also explained above for the "registering" terms (*see supra* at 33-39), IPA previously emphasized to the Court "***the vital role of the facilitator in the patented invention***," explaining "the specification provides that ***an agent registers its capabilities with the facilitator, meaning the facilitator subsequently enters those capabilities within the registry***." *IPA/Amazon*, D.I. 118 at 15, 62. IPA was right then, and the specification is no different today.

IPA's argument is also premised on flawed logic. Instead of looking at "active" in the asserted claims, IPA looks to a single phrase from claim 4 (which does not include that term)—

invalidated and not asserted here—"deactivating a specific client agent no longer available to provide services," as evidence that an "active" agent is merely one "available to receive requests." But an agent "no longer available to provide services" would not be "active" under IPA's construction and would not require claim 4's step of "deactivating" it. In other words, IPA's logic amounts to "deactivating" an already inactive agent, which is counter-intuitive and does not support IPA's construction of "active agent" in a separate claim.

### 3. IPA's Reply Position

Google seeks to construe these terms to require "*maintaining* a communication link," even though nothing in the specification suggests that an active agent requires a constant, or maintained, connection. And Google again seeks to import a "facilitator" from the specification into claims when ***none*** of the relevant claims recite it.

First, Google relies on disclosures in the specification indicating that agents "establish" a connection. But the specification only discusses "establishing" communication links in the context of agent registration. (Ex. A, Fig. 8, 7:19-21; 17:55-56.) ***Establishing*** a connection for agent registration does not suggest that the patent requires ***maintaining*** such a connection for every active agent in the community. Tellingly, the patent discloses nothing (like a persistent session or continuous link) that would require constantly maintaining the communication link. Rather, the specification describes an event-driven communication system where messages are exchanged as needed. (*Id.*, 10:51:11:1.) This suggests a transactional communication environment rather than a constant connection. In addition, the specification discloses embodiments where the facilitator does not initiate communications; it only responds to requests after agents have reached out to it. (*Id.*, 19:54-57.) And the specification discloses that an agent can "*modify* its solvables" after "connecting to its facilitator." (*Id.*, 12:11-14 (emphasis added).) No connection would be required to modify a solvable if the original communication link was constantly maintained.

Because the specification does not require, or even suggest, that all embodiments of the invention require a facilitator agent, the Court should reject Google's attempt to import this limitation into all asserted claims. *See Liebel-Flarsheim*, 358 F.3d 898 at 906.

**4. Google's Sur-Reply Position**

IPA's reply offers no support in the specification or elsewhere for IPA's construction ("available to receive requests"), explanation of where it comes from, or response to Google's rebuttal that IPA's proposed construction contradicts claim 4.

IPA does, however, concede that the specification discloses "establishing a connection." But it quibbles with the word "maintaining" versus "establishing" a communications link in Google's construction. IPA admits that "[e]stablishing a connection for agent registration" is a prerequisite for "maintaining such a connection," which narrows the dispute to whether such a connection is maintained, as Google submits, or repeatedly closed/re-established, as IPA suggests. *Supra* at 50.

But, the specification does not disclose closing/re-establishing a connection, but discloses only, as IPA admits, "establishing" a connection during initial registration. *Id.* Indeed, IPA's citations do not support its position: "communications ... structured around the transmission … of events" and "[a] facilitator preferably responds to requests" do not disclose closing/re-establishing a connection. '115 patent, 10:51-11:1, 19:54-57. IPA's third citation supports Google's construction: "an agent [may] … modify its solvables … ***at any time*** after connecting to its facilitator" because a connection is maintained after it is established without re-establishing the connection. *Id.*, 12:11-14.

IPA objects, as with the "registering" terms above, to the facilitator's centrality to the invention. For the same reasons, IPA's objection fails.

### G. "ICL" / "inter-agent communication language" / "inter-agent language"

| IPA's Construction | Google's Construction | Why Resolution Matters |
|---|---|---|
| "an interface, communication, and task coordination language" | "a non-RPC interface, communication, and task coordination language" | IPA's position: This claim has already been construed twice, and IPA's proposal mirrors that construction. Rather than proffer a true re-construction for this term, Google seeks to append an additional limitation. This is therefore a non-infringement position disguised as a request for claim construction.<br><br>Google's position: Resolution may impact validity and/or infringement, and may assist the jury. |

#### 1. IPA's Opening Position

The Court has already construed this term to mean "an interface, communication, and task coordination language" twice, rejected additional restrictions twice, and rejected a mid-litigation attempt to reopen the construction. Specifically, in the Amazon case, the Court construed this term to mean "an interface, communication, and task coordination language," rejecting both parties' attempts to include additional limitations and/or import preferred embodiments. (Case 1:16-cv-1266, D.I. 126, at 5.) The Court adopted this same construction in the Microsoft case at the parties' request. (Case 1:18-cv-1, D.I. 143, at 4-5.) Close to trial, Microsoft attempted to revisit the construction to add a new limitation but the Court refused and retained the original construction. (Case 1:18-cv-1, D.I. 357, at 2.) In sum, in both prior cases, the Court construed the claimed ICL to mean "an interface, communication, and task coordination language" and rejected any attempts

to append additional restrictions to the construction. The Court should reaffirm its prior construction, which mirrors IPA's proposal here.

IPA urges the Court to adopt its prior construction, which comes directly from the specification. (Ex. A, 10:49-51 ("Interagent Communication Language ("ICL") 418 refers to **an interface, communication, and task coordination language** preferably shared by all agents, regardless of what platform they run on or what computer language they are programmed in.") (emphasis added); *see also id.*, 10:40-42 ("the ICL of these patents is a language used between the agents of the system so they can **communicate, interface and coordinate the completion of tasks**.") (emphasis added). In this instance, the patentees acted as their own lexicographer, and that definition should govern. *See Phillips*, 415 F.3d at 1316. No further construction is necessary.

Despite this history, Google seeks to append an additional restriction by specifying that the claimed ICL must be "**a non-RPC** interface, communication, and task coordination language." "RPC" is an acronym for "remote procedure call," which is a call by one program to a second program on a remote system. (Ex. G, at 382.) The specification discusses RPC in the context of prior art distributed architectures, stating that a limitation of the prior approach is its "reliance on a remote procedure call (RPC) style of communication" (Ex. A, 3:3-5; 3:30-32) and that "RPC uses a blocking (synchronous) scheme that does not scale well for high-volume transactions." (*Id.*, 3:35-37.) In the context of prior art blackboard architectures, the specification relates that certain mechanisms for communication among independent agents "permit a much richer style of interaction among participants than can be expressed using a distributed object's RPC model or a blackboard architecture's centralized exchange approach." (*Id.*, 4:18-33.) The specification and claims make no other references to RPCs, nor do the file histories or IPRs.

The criticisms in the specification were not directed to RPCs generally, but to the fact that RPCs at that time were synchronous, meaning when the server is processing the call, the client is blocked (it waits until the server has finished processing before resuming execution). (Ex. H, 448.) Over time, RPCs were developed to be asynchronous and allow operations to be performed in parallel. For example, Google Web Toolkit uses an asynchronous RPC to communicate to the server service. (Ex. I ("synchronous RPC is a Bad Idea, even though it's so much more convenient for developers.").) In other words, the specification does not criticize RPCs on a universal level—it criticizes the limitations of a type of RPC known at the time. Nothing in the specification states or implies an RPC could not be used as a building block for an infringing system, only that they were not being used that way at the time.

On the other hand, the specification and claims do provide several examples of the ICL as independent of the underlying transport mechanism, meaning it can make use of an RPC. (*See, e.g.,* Ex. A, 10:49-53 ("Interagent Communication Language ("ICL") 418 refers to an interface, communication, and task coordination language preferably shared by all agents, **regardless of what platform they run on** or what computer language they are programmed in." (emphasis added); *id.*, cl. 1 ("using an expandable, platform-independent, inter-agent language"); *id.*, cl. 49 ("An ICL as recited in claim 48, wherein the ICL is computer platform independent.")). The specification's description of the ICL as platform-independent is the opposite of imposing a restriction based on the type of underlying communication mechanism. Adopting the "non-RPC" limitation of Google's construction would therefore amount to rewriting the claims, a practice the Federal Circuit forbids. *See Ecolab, Inc. v. FMC Corp.*, 569 F.3d 1335, 1344 (Fed. Cir. 2009).

In addition, when the patentee filed the '115 patent application, they included source code for the Open Agent Architecture, the SRI project from which the patents were derived, to help

practitioners construct a preferred embodiment of the patented invention. (Ex. A, 1:6-20.) As shown in that source code, OAA itself utilized (and built on) the "Distributed Object Approaches" described in the specification, including RPCs, for communication between agents and transmission of ICL events. (*Id.*, 2:47-4:16.) For example, the core "agent library procedures" in OAA, such as oaa_Solve() (*id.,* 11:1-9), exhibit two defining characteristics of an RPC; namely, (1) the interface presented to the programmer is that of an ordinary in-language procedure call and (2) the procedure is actually executed by remote, distributed agents.

Specifically, oaa_Solve is the agent library procedure that results in the event being transmitted from an agent to the facilitator. (Ex. A, 10:59-11:8 ("In a further preferred embodiment, a program element expressed in ICL is the event…For example, the agent library procedure oaa_Solve can be used by an agent to request services of other agents. A call to oaa_Solve, within the code of agent A, results in an event having the form ev_post_solve(Goal, Params) going from A to the facilitator, where ev_post_solve is the type, Goal is the content, and Params is a list of parameters."). As it relates to oaa_Solve(), the programmer documentation states that oaa_Solve() "**Sends work or information requests to distributed agents**, brokered by the Facilitator agent" and that "The default behavior … is to **act like the Prolog primitive** … **blocking until Goal is finished**, and unifying and backtracking over solutions for Goal." ((Ex. D, Appendix A.IV: liboaa.pl, at 259-262) (emphasis added).) Based on this code documentation, oaa_Solve (and the other OAA agent library procedures) are RPCs because, as stated in the specification, "a client can transparently invoke a method" (such as oaa_Solve) "on a remote server object" (such as a facilitator agent). (Ex. A, 3:12-13.) And, given that the source code, which represents a preferred embodiment, utilizes RPC principles, the claims cannot be construed to exclude it. *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583-84 (Fed. Cir. 1996).

In sum, nothing in the specification or claims prohibits the ICL from using an RPC. "The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998). IPA's construction aligns with the specification and the Court's construction in both earlier cases. The Court should adopt its earlier construction and reject Google's attempt to read a restriction into the construction that is not supported by the intrinsic record.

**2. Google's Answering Position**

The patents clearly and unmistakably disclaim RPC from the scope of ICL. IPA does not dispute the specification disparaged RPC. Rather, IPA's primary argument is that the specification disparaged only one aspect of RPC, that RPCs were "synchronous." *Supra* at 54. Not so. Indeed, the passage that IPA relies on introduces its "synchronous" criticism "***[i]n addition***" to a separate criticism of RPC. '115 patent, 3:30–37. In fact, the specification repeatedly disparages RPC, describes the agent-based ICL as circumventing the disparaged limitations of RPC, and describes ICL and non-RPC features as important to the purported invention. "Where the specification makes clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patent, even though the language of the claims, read without reference to the specification, might be considered broad enough to encompass the feature in question." *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1341 (Fed. Cir. 2001).

**a. The Specification Disavows RPC By Both Repeatedly Disparaging It And Expressly Distinguishing It From The Invention And ICL**

The specification disclaims RPC by repeatedly disparaging RPC communication as a whole. *See Indivior Inc. v. Dr. Reddy's Labs.*, 930 F.3d 1325, 1337-38 (Fed. Cir. 2019) ("A specification

may disclaim an embodiment by repeatedly disparaging it."). The specification begins by disparaging prior art communication that "reli[ed] on a remote procedure call (RPC) style of communication" because of the resulting failure to "facilitate programming" in a model that would "exploit the potential for parallel computation"—a major drawback "in a distributed environment." '115 patent, 3:30–35. The specification then criticizes ***another*** aspect of using RPC: "***In addition***, RPC uses a blocking (synchronous) scheme that does not scale well for high-volume transactions." *Id.*, 3:36–37. The patents' Background then enumerates advantages of an "agent-based" (ultimately claimed) approach over an "RPC model," explaining RPC did not permit the former's "richer style of interaction." *Id.*, 4:21–32. In doing so, the specification explained that such agent-based systems improved over RPC-based systems' shortcomings with the agent-based communication scheme (as claimed by the patents with an ICL): "Effective communication among independent agents requires four components … [which] permit a much richer style of interaction among participants than can be expressed using a distributed object's RPC model…" '115 patent, 4:21–32.

In other words, the patents explained that the claimed ICL had numerous benefits over RPC—beyond merely asynchronous calls, as IPA suggests. This repeated disparagement and distinguishing of RPC disclaims it from the scope of the claims. *Indivior*, 930 F.3d at 1337–38.

This discussion of RPC goes to the core of the claimed invention. Every claim is addressed to an agent-based architecture (which the specification expressly distinguished from RPCs) using an Interagent Communication Language (which encompasses the advantages the specification touted over RPCs). *See* '115 patent, 4:21-32 ("Agent-based" systems include components "(2) an interaction protocol," "(3) a content language," and "(4) an agreed upon set of shared vocabulary" reflected in the ICL that permit "a much richer style of interaction among participants than can be

expressed using a distributed object's RPC model"). The Federal Circuit has "found disclaimer limiting a claim element to a feature of the preferred embodiment when the specification described that feature as a 'very important feature ... in an aspect of the present invention' and disparaged alternatives to that feature." *Hill-Rom Servs.*, 755 F.3d at 1372. Similarly, the Federal Circuit finds disclaimer "when the specification indicated that … a particular step was 'require[d]'" or "an important feature." *Id.*

Here, the specification identifies features of an agent-based approach reflected in the patents' ICL that the specification uses to distinguish an "RPC model." These are not one-off, ancillary references, but rather aspects that the specification ties to the "present invention" and describes as "require[d]" and "essential" and as enabling a "most important" feature:

- "In particular, ***the present invention teaches***… communication and cooperation among distributed electronic agents." '115 patent, 1:27-29. "Effective communication among independent agents ***requires four components***: [including] (2) an interaction protocol… (3) a content language… Such mechanisms permit a much richer style of interaction among participants than can be expressed using a distributed object's RPC model…" *Id.*, 4:21–32.
- "[T]he ICL includes: a layer of conversational protocol… and a content layer…" *Id.*, cl. 29.
- "[E]very participating agent defines and publishes a set of capability declarations, expressed in ICL, describing the services that it provides.… This interface is used by a facilitator in communicating with the agent, and, ***most important***, in delegating service requests…." *Id.*, 12:2–9.

- "Cooperation among agents in accordance with the present invention is preferably achieved via messages expressed in a common language, ICL." *Id.*, 10:40–42.

The specification's description of ICL features as important, coupled with its disparagement of RPC, operates as disavowal of RPC from the scope of ICL. *Hill-Rom Servs.*, 755 F.3d at 1372.

### b. IPA's Arguments Mischaracterize The History And The Evidence

IPA's reliance on previous litigation is misplaced because the present issue of RPC-disclaimer was neither raised nor decided before. *See supra* at 52-53. Indeed, the construction of ICL in *IPA/Amazon* involved an entirely different issue: Amazon sought to limit ICL to "used by agents, regardless of what platform they run on or what computer language they are programmed in." *IPA/Amazon*, D.I. 118 at 29. That is irrelevant to the present dispute and does not control the construction here.

IPA argues that no disclaimer attaches because the specification's criticism of RPC was "not directed to RPCs generally, but to the fact that RPCs at that time were synchronous," but this mischaracterizes the evidence (as detailed above) and is contrary to law. *See supra* at 54. IPA's argument violates the central tenet of claim construction: that claim terms are construed "as understood by a person of ordinary skill in the art ***at the time of invention***." *Iridescent Networks v. AT&T Mobility, LLC*, 933 F.3d 1345, 1350 (Fed. Cir. 2019). Subsequent developments in technology are irrelevant and cannot overcome disclaimer. Moreover, as explained above, the specification disparaged RPC as a whole for multiple other failings inherent in RPC.

IPA also argues that "platform-independent" claim limitations on ICL broaden its scope to recapture RPC, but IPA's argument contradicts the specification and the plain meaning of "platform" in the art. *See supra* at 54. RPC is not a "platform." The specification uses "platform"

to mean a type of environment capable of running applications—for example, an "operating system" or "application runtime," consistent with how the term is used in the relevant art. *See, e.g.*, '115 patent, 10:30–38 ("Support lightweight mobile platforms. Such platforms should be able to serve as hosts for agents, without requiring the installation of a massive environment."). Any POSITA would know that RPC is not a "platform" because it is not a type of environment capable of running applications.

Finally, IPA argues that "oaa_Solve" embodies RPC and thereby recaptures its scope into the claimed ICL, but none of the exhibits IPA points to demonstrate use of an RPC by the ICL. Rather, this is pure attorney argument. *See supra* at 55. Tellingly, IPA provides no factual or expert support for what the supposedly "defining" characteristics of RPC are and no factual support that oaa_Solve exhibits them. In fact, RPC has many characteristics, such as a stub-based architecture and a run-at-most-once guarantee—but IPA does not and cannot provide evidence that OAA embodies these RPC characteristics. Ex. J (RPC paper) at 43–49. In addition, IPA's position is inconsistent with the specification. The specification uses "call" in the context of RPCs (which it disparages) and local function calls such as library procedures (which are not RPCs), but in the context of inter-agent communication it uses other words like "message" and "event." *See, e.g.*, '115 patent, 22:32–49 ("For example, to request a service of another agent, an agent preferably ***calls the library procedure oaa_Solve***. This call results in a ***message to a facilitator***, which will exchange messages with one or more service providers…."). In other words, the specification specifically distinguishes oaa_Solve from both RPC and ICL—fatal to IPA's argument.

IPA's citation to source code documentation of oaa_Solve without an expert is unavailing and unadorned attorney argument. IPA hinges its argument on the erroneous assumption that any function call that causes computation elsewhere is by definition an RPC (it is not). IPA further

ignores other parts of the documentation that undercut its argument, such as where it plainly states oaa_Solve's "default" behavior is parallel computation where "multiple agents that can solve the Goal will attempt to work on it in parallel." Ex. D, Appendix A.IV at 56. The specification expressly distinguished such parallel processing from RPCs: "this single thread of execution model does not facilitate programming to exploit the potential for parallel computation." '115 patent, 3:32–35. Indeed, an RPC would not have many participants executing the procedure—rather, it would "guarantee that if the call returns to the user then the procedure in the server has been ***invoked precisely once***." Ex. J (RPC paper) at 49. Thus, IPA has not established (and cannot establish) the oaa_Solve embodies RPC and therefore cannot rely on oaa_Solve to establish that RPC was somehow "recaptured" despite its clear disclaimer from scope.

#### c. IPA's Extrinsic Evidence Is Inapposite Because It Is Not At The Appropriate Level Of Skill And Is Not Contemporaneous

IPA's extrinsic evidence should be disregarded in any event. Exhibit G is inapposite because it is too elementary for a POSITA. "Thread," "execution," "parallel computation," and "blocking" are all technical concepts mentioned in the specification in the context of RPC (*see* '115 patent, 3:30–37), and each has specific meaning that a POSITA would understand but is too advanced for Exhibit G. Because Exhibit G fails to meaningfully engage with those concepts, it fails to inform how a POSITA would understand ICL, RPC, and the disclaimer.

Exhibit H operates in the wrong context, focusing on aspects like "timing signal" and "control signals"—telecommunication hardware concepts irrelevant to the patents and to the disputes here. Thus, it does not operate at the necessary level of skill in the relevant art and fails to inform how a POSITA would understand the patents.

Exhibit I must be disregarded as a matter of law. Exhibit I bears no date earlier than 2006—which is *seven years* after the invention. And IPA does not assert that Exhibit I reflects the

contemporaneous meaning of RPC. *See supra* at 54. This reference is "dated well after the [asserted patents], … [is] not contemporaneous with the patent[s], do[es] not reflect the meanings that would have been attributed to the words in dispute by persons of ordinary skill in the art as of the [date of the invention], and for those reasons [is] not considered in … claim construction analysis." *Brookhill-Wilk 1, LLC. v. Intuitive Surgical, Inc.*, 334 F.3d 1294, 1299 (Fed. Cir. 2003). IPA's arguments about how RPC supposedly developed in the future are similarly irrelevant, because claim terms are construed "as understood by a person of ordinary skill in the art ***at the time of invention***." *Iridescent Networks v. AT&T Mobility, LLC*, 933 F.3d 1345, 1350 (Fed. Cir. 2019).

IPA's arguments fail. Google asks the Court to adopt Google's construction of "ICL" recognizing the disclaimer of RPC.

### 3. IPA's Reply Position

#### a. The Patentee Did Not Disclaim Any Specific RPCs

"The standard for disavowal of claim scope is . . . exacting." *Thorner v. Sony Comput. Ent. Am. LLC*, 669 F.3d 1362, 1366 (Fed. Cir. 2012). Ambiguous language cannot support disavowal, *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003), and disavowal requires that "the specification make[ ] clear that the invention does not include a particular feature." *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1341 (Fed. Cir. 2001). More specifically, to find disavowal, a court must find that the specification is "both so clear as to show reasonable clarity and deliberateness, and so unmistakable as to be unambiguous evidence of disclaimer." *Dealertrack, Inc. v. Huber*, 674 F.3d 1315, 1322 (Fed. Cir. 2012). There is no clear, unmistakable, and unambiguous evidence of disclaimer here.

The specification mentions RPC three times:[19]

(1) "Another restriction of the DOOP approach is the result of its reliance on a remote procedure call (RPC) style of communication. Although easy to debug, this single thread of execution model does not facilitate programming to exploit the potential for parallel computation that one would expect in a distributed environment." (Ex. A, 3:30-35);

(2) "RPC uses a blocking (synchronous) scheme that does not scale well for high-volume transactions." (*Id.*, 3:36-37); and

(3) "Such [communication] mechanisms permit a much richer style of interaction among participants than can be expressed using a distributed object's RPC model or a blackboard architecture's centralized exchange approach." (*Id.*, 4:29-33.)

These statements, which are at best mild criticisms of some types of RPCs, are not clear and unambiguous disavowals of all RPCs. In (1), the patentee notes that the specifically referenced RPC does not fully exploit the potential for parallel computation. That is hardly a wholescale disavowal of RPC generally. In (2), the specification mentions that synchronous RPC "does not scale well"—again, nothing more than a statement of fact about a particular type of RPC. And, in (3), the "communication mechanisms" described and compared to a particular RPC are general mechanisms for effective communication used at that time. Under the law's exacting standard, the patentee did not disclaim even these specific RPCs.

To the extent the Court finds any of the three statements above amount to disparagement of the specific RPCs discussed (which it should not), there is "a high bar to finding disavowal of claim scope through disparagement of the prior art in the specification." *Openwave Sys., Inc. v. Apple Inc.*, 808 F.3d 509, 517 (Fed. Cir. 2015). "To find disavowal of claim scope through disparagement of a particular feature, courts ask whether "the specification goes well beyond

[19] The specification does not describe or limit any embodiment as "non-RPC," nor do any descriptions or drawings distinguish or even mention RPC (nor do the claims). The file histories do not mention RPC at all.

expressing the patentee's preference ... [such that] its repeated derogatory statements about [a particular embodiment] reasonably may be viewed as a disavowal." *Chicago Bd. Options Exch., Inc. v. Int'l Sec. Exch., LLC*, 677 F.3d 1361, 1372 (Fed. Cir. 2012). That exacting standard is not met here.

This Court has found no disclaimer under similar circumstances. For example, in *Allergan, Inc. v. Revance Therapeutics, Inc.*, C.A. No. 21-cv-1411-RGA, 2023 WL 5562417, at *5 (D. Del. Aug. 29, 2023), the Court found "[t]he '740 patent specification does not meet the high bar for disavowal. Acid precipitation is not repeatedly disparaged throughout the specification . . .If anything, the specification's mention of drawbacks merely describes a preference for filtration over acid precipitation. . . . The specification's discussion of acid precipitation does not rise to the level of repeated and clear disparagement required to disavow acid precipitation from the claim's scope. A preferred method or embodiment does not disclaim other embodiments. . . . A POSA would understand that any of the methods mentioned in the specification, including filtration, centrifugation, or acid precipitation, could be used to obtain the clarified culture from the fermentation culture."). Similarly, here the patentee also did not repeatedly disparage RPCs throughout the specification and, if anything, only stated a possible preference for using a non-RPC model. That does not amount to a clear and unambiguous disavowal of claim scope. *See Epistar Corp. v. Int'l Trade Comm'n*, 566 F.3d 1321, 1337 (Fed. Cir. 2009).

In *Vifor Fresenius Med. Care Renal Pharma Ltd. v. Annora Pharma Private Ltd.*, C.A. No. 18-cv-1996 (MN), 2020 WL 2085634, at *3 (D. Del. Apr. 30, 2020), the Court also found no disclaimer under similar facts: "Here, the specification states that 'phosphate absorbers with high iron loadings are still not available.' And then it notes that problems with ease of administration and storage and stability exist. . . . I do not read these paragraphs as a clear and unmistakable

disavowal of claim scope." Similar to here, noting problems with or unavailability of particular technology does not amount to a disclaimer of that technology from the claim scope. *See also T-Jat Sys. 2006 Ltd. v. Expedia, INC. (DE)*, C.A. No. 16-cv-581-RGA, 2019 WL 3944014, at *4 (D. Del. Aug. 21, 2019) (similar).

The Federal Circuit has also found no disclaimer in comparable circumstances. In *Taction Tech., Inc. v. Apple Inc.*, No. 2023-2349, 2025 WL 2336950, at *6 (Fed. Cir. Aug. 13, 2025), the Court found that a first disclosure in the specification did not clearly and unmistakably disparage a particular transducer, even though it described the transducer's Q-factor as "high" and "useless." A second disclosure also did not clearly and unmistakably disparage a transducer with a Q-factor of 1.5 to 3 because such statements "can reasonably be interpreted as factual observations rather than disparaging statements."

Cases finding disclaimer involve much clearer and unambiguous statements than are stated in the above cases and the Asserted Patents' specification. For example, in *Openwave Sys.*, the Federal Circuit affirmed the district court's finding of disclaimer where (1) the description of the patents-in-suit specified that it did not include the disparaged prior art; (2) the single embodiment of the patented invention clearly described a mobile device that did not employ the prior art and distinguished the prior art; and (3) the specification was rife with remarks that disparaged the prior art. 808 F.3d at 514. On the contrary, "where the reason for distinguishing the prior art is ambiguous, there can be no basis for concluding that Plaintiffs clearly and deliberately disavowed claim scope." *Sanofi-Aventis U.S. LLC v. Merck Sharp & Dohme Corp.*, C.A. No. 16-cv-812-RGA, 2018 WL 389183, at *3 (D. Del. Jan. 12, 2018).

**b. The Patentee Did Not Disclaim RPCs Generally**

As explained, the specification only discusses a narrow class of RPCs available at the time of the invention. Yet Google seeks to exclude the use of a much broader class of RPCs—namely,

all of them. Google's proposed exclusion of ***all*** RPCs, even those not mentioned in the specification, is far too broad to be correct.

First, Google argues that the specification's alleged disparaging of some primitive RPCs (*e.g.*, synchronous RPCs or those that did not support one-to-many transmission of events), supports a construction that would broadly exclude any RPC—even those that are asynchronous or support one-to-many event transmission. That conclusion does not logically follow from the three specific mentions of RPCs in the specification. To put a finer point on it, the specification does not criticize any immutable characteristics or limitations of RPCs generally. A POSITA at the time would have recognized that RPC was a flexible method that could be adapted for different situations. The paper submitted by Google illustrates this: "We believe the parts of ***our RPC package*** here discussed are of general interest in several ways. ***They represent a particular point in the design spectrum of RPC***." (Ex. J, 59 (emphasis added).)

Second, the specification arguably explains why certain then-existing RPCs were not sufficient, standing alone, to accomplish the goals of the invention. But these limitations do not negate the possibility that an RPC could be used within an agent-based system, provided that the system also included more than just the built-in capabilities of existing RPCs—which it does.

Third, with respect to Google's arguments about the OAA source code, Google first asserts that IPA did not provide evidence that OAA embodied RPC's "stub-based architecture." But RPC's "stub-based architecture" is what IPA identified as "the interface presented to the programmer [] of an ordinary in-language procedure call." Therefore, Google agrees this interface is a key feature of RPCs. (*See* Ex. J, 43 ("When the user wishes to make a remote call, it actually makes a perfectly normal local call which invokes a corresponding procedure in the user-stub.").

Google next argues that "[t]he specification uses 'call' in the context of RPCs (which it disparages) and local function calls such as library procedures (which are not RPCs), but in the context of inter-agent communication it uses other words like 'message' and 'event.'" But this argument mischaracterizes how RPCs work and is contradicted by Google's own cited document. (*See* Ex. J, 43 ("The user-stub is responsible for placing a specification of the target procedure and the arguments into one or more ***packets*** and asking the RPCRuntime to transmit these reliably to the callee machine. ***On receipt of these packets***, the RPCRuntime in the callee machine passes them to the server-stub." The packets are a message, so the "call" to the "user-stub" "results in a message.") (emphasis added).)

Lastly, Google claims that "[t]he specification expressly distinguished such parallel processing from RPCs: 'this single thread of execution model does not facilitate programming to exploit the potential for parallel computation.' '115 patent, 3:32–35. Indeed, an RPC would not have many participants executing the procedure—rather, it would 'guarantee that if the call returns to the user then the procedure in the server has been invoked precisely once." (Ex. J, 49). But this argument again relies on a specific, narrow definition of an RPC (*i.e.*, an RPC that has the "precisely once" semantics). Despite this, Google proposes to exclude all RPCs, including those that don't have "precisely once" semantics, from the claim scope.

The Court should not append Google's unfounded "non-RPC" limitation to a construction it has already handed down twice, especially when the Court's prior construction comes directly from the patentee's definition in the specification.

**4. Google's Sur-Reply Position**

IPA retreats from its original position that the specification criticizes RPC only for being "synchronous," now admitting to "three … criticisms." *Supra* at 63. The remaining disputes boil down to: to what degree does the specification disparage RPC and whether a contemporary

understanding of RPCs from decades after the invention-date—the basis for IPA's argument regarding "types" of RPC—is proper in that inquiry. IPA's argument misses two fundamental points.

*First*, IPA has no meaningful response to the specification specifically distinguishing RPC from defining elements of the claimed ICL terms. The specification declares, "Effective communication among independent agents ***requires*** four components" which "permit a much richer style of interaction among participants ***than can be expressed using … RPC***." '115 patent, 4:21-33. Two of the enumerated required components ("(2) an interaction protocol" and "(3) a content language") are claimed layers of the ICL. *Id.* Another required component is "(1) … carrying messages in an asynchronous fashion," which forecloses RPC. *Id.* Indeed, IPA admits "RPC use[d] a blocking (synchronous) scheme" "at that time" of the invention.[20] *Id.*, 3:36; *supra* at 53-54. IPA's recasting of the patents' criticism of RPCs as "mild" is belied by the specification. *Supra* at 63. To the contrary, the specification makes clear that RPC cannot meet requirements of the claimed ICL and a central object of the invention.

*Second*, IPA's arguments about "types" of RPC improperly project knowledge of later technology back in time to a POSITA at the invention date. This error permeates IPA's argument. Citing no intrinsic evidence, IPA attempts to divide RPC into "types" that are "specific" and "narrow," to cabin disparagement to "certain then-existing RPCs," a "narrow class" of "primitive RPCs." *Supra* at 63-64, 65-66. The specification supports no such parsing and makes no mention of RPC "types" at all. IPA tacitly acknowledges as much by hypothesizing about "the possibility" that RPC "could be adapted" or "could be used" through later development in a different way.

[20] IPA's Opening admitted "the fact that RPCs at that time were synchronous" but its Reply attempts to cabin "synchronous RPC" to "a particular type of RPC." *Supra* at 54, 63.

*Id.*, 14. None of this reflects the correct inquiry: how a POSITA would understand the patents ***at the time of the invention***. Here, the disparagements are categorical (*e.g.*, "RPC uses…") and never qualified by "types" or future "adaptations." IPA's cited authorities all turned on facts not present here. *Allergan* found "acid precipitation" not disavowed because the specification "describe[d] multiple methods … including … acid precipitation." 2023 WL 5562417, at *4-5. *Vifor* found "less than 35%" not disavowed from "high loading" because the specification "define[d] 'high loading' … as … 10 to 80%" and disclosed embodiments "containing less than 35%." , 2020 WL 2085634, at *2. And *Taction* found no disavowal from claimed "***highly damped***" transducers because the disparagement was of "***un-damped*** … actuators." 2025 WL 2336950, at *5-6. But the specification here does not define ICL to include RPC or include embodiments of ICL that use RPC. Instead, it disparages RPC as lacking required components of the claimed ICL. '115 patent, 1:27-29, 4:21-33. This is analogous to cases finding disavowal. *See, e.g.*, *Indivior*, 930 F.3d at 1337 (disparagement disavowed "conventional top air drying" because it "does not produce uniform films, the central object of the claimed invention").

IPA's technical arguments are unsupported attorney argument—and wrong regardless. RPC's "stub-based architecture" is not a mere "interface." *Supra* at 66-67. For example, an RPC stub "pack[s] and unpack[s] arguments and results" and "dispatch[es] to the correct procedure" on the remote machine, having "semantics … as close as possible" to the originating call. Ex. J, 43-44. Likewise, that RPCs send "packets" is a red herring: all internet communications—RPC or not—send packets. This does not transform the ICL into RPC or negate the manifest exclusion of RPCs in the specification.

The specification clearly distinguishes RPCs from claimed requirements of the ICL and the object of the invention. This is not mild. It is disavowal.

Dated: August 25, 2026

BAYARD, P.A.

/s/ Stephen B. Brauerman
Stephen B. Brauerman (#4952)
Ronald P. Golden III (#6254)
600 N. King Street, Suite 400
Wilmington, DE 19801
(302) 655-5000
sbrauerman@bayardlaw.com
rgolden@bayardlaw.com

*Of Counsel:*

Paul J. Skiermont
Jaime K. Olin
Steven W. Hartsell
Kevin P. Potere
Todd A. Martin
SKIERMONT DERBY LLP
1601 Elm Street, Suite 4400
Dallas, TX 75201
(214) 978-6600
pskiermont@skiermontderby.com
jolin@skiermontderby.com
shartsell@skiermontderby.com
kpotere@skiermontderby.com
tmartin@skiermontderby.com

Mieke K. Malmberg
SKIERMONT DERBY LLP
633 West Fifth Street, Suite 5800
Los Angeles, CA 90071
(213) 788-4500
mmalmberg@skiermontderby.com

*Attorneys for Plaintiff*
*IPA Technologies Inc.*

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

/s/ Rodger D. Smith II
Rodger D. Smith II (#3778)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19801
(302) 658-9200
rsmith@morrisnichols.com

*Of Counsel:*

Michael C. Hendershot
Evan McLean
Matthew Everts
Walter Mostowy
JONES DAY
1755 Embarcadero Road
Palo Alto, CA 94303
(650) 739-3939

*Attorneys for Defendant*
*Google LLC*