**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| IPA TECHNOLOGIES INC.,<br>Plaintiff,<br>v.<br>GOOGLE LLC,<br>Defendant. | Civil Action No. 18-318-RGA |

MEMORANDUM OPINION

Stephen B. Brauerman, Ronald P. Golden, III, BAYARD, P.A., Wilmington, DE; Alexander E. Gasser, Charles C. Koole, Kevin P. Potere (argued), Michael D. Ricketts, Paul J. Skiermont, SKIERMONT DERBY LLP, Dallas, TX; Jaime K. Olin (argued), Steven W. Hartsell, STRIS & MAHER LLP, Dallas, TX,

Attorneys for Plaintiff.

Rodger Dallery Smith , II, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE; Evan M McLean, Matthew M. Everts, Michael C. Hendershot (argued), Walter Mostowy (argued), JONES DAY, Silicon Valley, CA,

Attorneys for Defendant.

November 9, 2026

**ANDREWS, U.S. DISTRICT JUDGE:**

Before me is the issue of claim construction of multiple terms in U.S. Patent No. 6,851,115 (the "'115 patent"), U.S. Patent No. 7,069,560 (the "'560 patent"), and U.S. Patent No. 7,036,128 (the "'128 patent"). The parties submitted a Joint Claim Construction Brief (D.I. 131) and a Joint Claim Construction Chart (D.I. 117). I heard oral argument on October 14, 2026. (Markman Tr.).[1]

## I. BACKGROUND

On February 26, 2018, IPA Technologies Inc. ("IPA") filed a complaint against Google LLC ("Google") alleging infringement of the '115 patent, the '560 patent, the '128 patent, and three other patents no longer at issue. (D.I. 1 at 58, 77, 91, 106, 118, 127; D.I. 32).[2] The '115 and '560 patents are directed to "[a] highly flexible, software-based architecture" that supports "cooperative task completion." '115 patent, Abstract; '560 patent, Abstract. The '128 patent is directed to "[a] highly mobile, ambient computing environment . . . for serving a knowledge worker away from [] their desk." '128 patent, Abstract.[3]

On January 10, 2020, IPA's case against Google was stayed pending the Patent Trial and Appeal Board's ("PTAB") completion of *inter partes review* ("IPR") of the three remaining patents-in-suit. (D.I. 77). The stay was lifted on March 16, 2026. (D.I. 100). The currently asserted claims are claims 9–10 and 29–45 of the '115 Patent, claims 50–51 and 53–55 of the '560 Patent, and claims 23–27 and 40 of the '128 Patent. (D.I. 93 at 2).

---

[1] Citations to the transcript of the argument, which is docketed as D.I. 179, are in the format "Markman Tr. at ----."

[2] IPA filed fourteen other lawsuits in this Court. Twelve of those were quickly resolved. Two of them were not. *IPA Techs Inc. v. Amazon.com, Inc.*, No. 16-1266- RGA (D. Del. filed Dec. 19, 2016) ("*IPA/Amazon*"), had Markman proceedings and was decided on summary judgment. *IPA Techs Inc. v. Microsoft Corp.*, No. 18-1-RGA (D. Del. filed Jan. 1, 2018) ("*IPA/Microsoft*"), had Markman proceedings, went to trial, and was later settled.

[3] The three patents each claim a priority date of January 5, 1999. The '560 patent is a continuation of the '115 patent; the '128 patent is a continuation-in-part of the '115 patent.

## II. LEGAL STANDARD

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (internal quotation marks omitted). "'[T]here is no magic formula or catechism for conducting claim construction.' Instead, the court is free to attach the appropriate weight to appropriate sources 'in light of the statutes and policies that inform patent law.'" *SoftView LLC v. Apple Inc.*, 2013 WL 4758195, at *1 (D. Del. Sept. 4, 2013) (alteration in original) (quoting *Phillips*, 415 F.3d at 1324). When construing patent claims, a court considers the literal language of the claim, the patent specification, and the prosecution history. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 977–80 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). Of these sources, "the specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Phillips*, 415 F.3d at 1315 (internal quotation marks omitted). "While claim terms are understood in light of the specification, a claim construction must not import limitations from the specification into the claims." *Deere & Co. v. Bush Hog, LLC*, 703 F.3d 1349, 1354 (Fed. Cir. 2012) (citing *Phillips*, 415 F.3d at 1323).

"[T]he words of a claim are generally given their ordinary and customary meaning. . . . [Which is] the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1312–13 (citations and internal quotation marks omitted). "[T]he ordinary meaning of a claim term is its meaning to [an] ordinary artisan after reading the entire patent." *Id.* at 1321 (internal quotation marks omitted). "In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction

in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314.

When a court relies solely upon the intrinsic evidence—the patent claims, the specification, and the prosecution history—the court's construction is a determination of law. *See Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 331 (2015). The court may also make factual findings based upon consideration of extrinsic evidence, which "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Phillips*, 415 F.3d at 1317–19 (quoting *Markman*, 52 F.3d at 980). Extrinsic evidence may assist the court in understanding the underlying technology, the meaning of terms to one skilled in the art, and how the invention works. *Id.* Extrinsic evidence, however, is less reliable and less useful in claim construction than the patent and its prosecution history. *Id.*

## III. CONSTRUCTION OF AGREED-UPON TERMS

The parties agreed upon numerous claim constructions by the time the joint brief was submitted. (D.I. 131 at 2–4). I adopt them without setting them forth here. After briefing, the parties resolved a few of the other disputes. (D.I. 174 at 1 n.1; *id.* at 3 n.2; D.I. 176; D.I. 178). I adopt the more recent agreed-upon constructions, which I understand to be:

| **Claim Term** | **Claims** | **Construction** |
|---|---|---|
| "mobile, ambient computing environment" | '128 patent, preamble of claim 22 | Preamble is limiting. |
| "request for a service" / "service request" | '115 patent, claims 9, 10, 29–45<br><br>'560 patent, | "a user request that is recited in the claimed ICL and must meet every requirement of the claimed ICL" |

| | | |
|---|---|---|
| | claims 50, 51, 53–55 | |
| "registering . . ." limitation | '128 patent, claim 22 | The steps must be performed in the order written. |
| "registering a description . . ." step | '115 patent, claim 1 | The step can be performed at any point in the method (including in parallel with other steps) up until the "a suitable delegation . . ." step. |
| "providing an agent registry . . ." step | '115 patent, claim 29 | The step can be performed at any point in the method (including in parallel with other steps) up until the "selecting service-providing electronic agents . . ." step. |
| "providing a plurality of synchronized agent registries . . ." step | '560 patent, claim 50 | The step can be performed at any point in the method (including in parallel with other steps) up until the "using said reasoning to coordinate and schedule efforts by the service-providing electronic agents . . ." step. |
| "providing a plurality of synchronized agent registries . . ." step | '560 patent, claim 53 | The step can be performed at any point in the method (including in parallel with other steps) up until the "using said reasoning to coordinate and schedule efforts by the service-providing electronic agents . . ." step. |
| "determining any task completion advice . . ." step | '115 patent, claim 29 | This step can be performed in parallel/overlap with or in reverse order from the "determining any task completion constraints . . ." step, and vice versa. |
| "determining whether the request service . . ." step | '115 patent, claim 29 | This step can be performed in parallel/overlap with or in reverse order from the "determining sub-goals required . . ." step, and vice versa. |

## IV. CONSTRUCTION OF DISPUTED TERMS

The parties agree that independent claim 29 of the '115 patent is representative for the purpose of claim construction. (D.I. 131 at 1).

> 29. A computer program stored on a computer readable medium, the computer program executable to facilitate ***cooperative task completion*** within a distributed computing environment, the distributed computing environment including a plurality of autonomous electronic agents, the distributed computing environment supporting an ***Interagent Communication Language***, the computer program comprising computer executable instructions for:
>
> ***providing an agent registry that declares capabilities of service-providing electronic agents currently active within the distributed computing environment***;

interpreting a service request in order to determine a base goal that may be a compound, arbitrarily complex base goal, the service request adhering to an ***Interagent Communication Language (ICL)***, [wherein] the ***ICL*** includes:

a layer of conversational protocol defined by event types and parameter lists associated with one or more of the events, wherein the parameter lists further refine the one or more events; and

a content layer comprising one or more of goals, triggers and data elements associated with the events;

the act of interpreting including the sub-acts of:

determining any task completion advice provided by the base goal, and

determining any task completion constraints provided by the base goal;

constructing a base goal satisfaction plan including the sub-acts of

determining whether the request service is available,

determining sub-goals required in completing the base goal by using reasoning that includes one or more of domain-independent coordination strategies, domain-specific reasoning, and application-specific reasoning comprising rules and learning algorithms,

selecting service-providing electronic agents from the agent registry suitable for performing the determined sub-goals, and

ordering a delegation of sub-goal requests complete the requested service; and

implementing the base goal satisfaction plan.

('115 patent, 31:48–32:22 (disputed terms bolded and italicized)).

**A. Preambles, "cooperative task completion" ('115 patent claims 1, 29, '560 patent claims 50, 53), "dynamically expandable" ('560 patent claim 53)**

a. *Plaintiff's proposed construction*: "Cooperative task completion" and "dynamically expandable" are not limiting in preambles.
b. *Defendant's proposed construction*: "Cooperative task completion" and "dynamically expandable" are limiting.in preambles.
c. *Court's construction*: "Cooperative task completion" is not limiting and "dynamically expandable" is limiting.

The parties agree that the preambles in these three patents generally are limiting (D.I. 131 at 15), but they dispute whether the terms "cooperative task completion," recited in the preambles of the '115 patent and the '560 patent, and "dynamically expandable," recited in the preamble of the '560 patent, are limiting. (*Id.* at 15–22). I find that "cooperative task completion" is not limiting and that "dynamically expandable" is limiting.

*Integra Lifesciences Corp. v. HyperBranch Med. Tech., Inc.* summarizes the standard for determining whether language in a preamble is limiting:

> The question of whether language in a preamble constitutes a claim limitation is a question of law. *Rotatable Techs. LLC v. Motorola Mobility LLC*, 567 F.App'x 941, 943 (Fed. Cir. 2014). "While it is true that preamble language is often treated as nonlimiting in nature, it is not unusual for [the United States Court of Appeals for the Federal Circuit] to treat preamble language as limiting[.]" *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 952 (Fed. Cir. 2006). Generally, "a preamble limits the invention if it recites essential structure or steps, or if it is necessary to give life, meaning, and vitality to the claim." *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002) (internal quotation marks and citation omitted); *see also Intellectual Ventures I LLC v. AT & T Mobility LLC*, C.A. No. 12–193–LPS, 2015 WL 1393386, at *24 (D. Del. Mar. 24, 2015). A preamble may also be construed as limiting when the claim limitations in the body of claim "rely upon and derive antecedent basis from the preamble[.]" *Eaton Corp. v. Rockwell Int'l Corp.*, 323 F.3d 1332, 1339 (Fed. Cir. 2003). On the other hand, when the claim body recites a structurally complete invention and the preamble language is used merely to state the purpose or intended use of the invention, the preamble is generally not treated as limiting the scope of the claim. *Catalina*, 289 F.3d at 808.

2018 WL 430177, at *1 (D. Del. Jan. 16, 2018), *report and recommendation adopted*, 2018 WL 11190945 (D. Del. Mar. 9, 2018).

The term "cooperative task completion" in the preambles of the '115 patent and the '560 patent does not provide an antecedent basis or recite an essential element of the claims. In the '115 patent, the preambles to claims 1 and 29 both contain the term "cooperative task completion," but the bodies of the claims do not. *See* '115 patent, 29:10–43, 31:48–32:23. Similarly, in the '560 patent, the preambles to claims 50 and 53 contain "cooperative task completion," but the

bodies of the claims do not. *See* '560 patent, 34:46–35:10, 36:1–27. So, none of the claims rely on "cooperative task completion" as an antecedent basis. In all four claims, "cooperative task completion" refers to a capability of the claimed features, but the term does not recite "essential structure or steps," and it is not "necessary to give life, meaning, and vitality to the claim." *Catalina*, 289 F.3d at 808.

Google argues that the Court should construe "cooperative task completion" as limiting because IPA advanced a construction of this phrase in *IPA Technologies Inc. v. Amazon.com, Inc.*, C.A. No. 16-1266-RGA ("*IPA/Amazon*"), and I construed the phrase to have its plain meaning, implicitly deciding that the phrase was limiting,[4] in that case. (D.I. 131 at 18 (citing *IPA/Amazon*, D.I. 129 at 49)). As a result, Google argues that IPA's position regarding "cooperative task completion" in this case is "incompatible with its previous representations to this Court." (*Id.*).

IPA's previous construction of "cooperative task completion" in *IPA/Amazon* does not affect IPA's ability to make the argument it advances in this case. The doctrine of issue preclusion "bars successive litigation of an issue of fact or law that was actually litigated, resolved in a valid court determination, and essential to that prior judgment, even if the issue recurs in the context of a different claim." *In re Adams*, 151 F.4th 144, 153 (3d Cir. 2025) (cleaned up). Issue preclusion applies when "(1) the identical issue was previously adjudicated; (2) the issue was actually litigated; (3) the previous determination was necessary to the decision; and (4) the party being precluded from relitigating the issue was fully represented in the prior action." *Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc.*, 458 F.3d 244, 249 (3d Cir. 2006).

Here, issue preclusion does not apply because the issue is not "identical." *Jean Alexander Cosmetics*, 458 F.3d at 249. The issue in *IPA/Amazon* was construction of the term "cooperative

---

[4] Google's point is that there is no reason to construe a term in a preamble unless it is limiting.

task completion / cooperative completion of the base goal." (*See IPA/Amazon*, D.I. 118 at 12). In contrast, here, the issue is whether the term "cooperative task completion" limits four patent claims by being in the preambles of those claims. (*See* D.I. 131 at 15). Thus, IPA's previous construction of "cooperative task completion" in *IPA/Amazon* does not prevent IPA from arguing in this case that "cooperative task completion" in the preambles of the '115 patent and the '560 patent does not limit the claims.

Google also contends that "cooperative task completion" is limiting because the term does not merely describe a benefit, "but rather gives meaning and vitality to the claims" because "cooperative task completion" is the point of the invention. (D.I. 131 at 18–19). However, as discussed above, the term does not recite "essential structure or steps" and thus does not "give life, meaning, and vitality" to the claims. *Catalina*, 289 F.3d at 808. Further, even if the term describes a "purpose" or "intended use" of the invention, "when the claim body recites a structurally complete invention and the preamble language is used merely to state the purpose or intended use of the invention, the preamble is generally not treated as limiting the scope of the claim." *Id.* Thus, I find that "cooperative task completion" in the preambles of the '115 patent and the '560 patent is not limiting.

Unlike "cooperative task completion," "dynamically expandable" forms part of an antecedent basis for a term in the body of claim 53 of the '560 patent. The term appears in the preamble of claim 53 as a part of the phrase, "a dynamically expandable Interagent Communication Language ("ICL")." '560 patent, 36:5–6. The body of claim 53 then references "the ICL" twice. '560 patent, 36:13. Thus, the phrase "a dynamically expandable Interagent Communication Language ("ICL")" serves as an antecedent basis for the "ICL" referenced in

claim 53's body, and limitations of claim 53 "rely upon and derive antecedent basis from the preamble[.]" *Eaton*, 323 F.3d at 1339.

IPA argues that the Court should construe "dynamically expandable" from the preamble of claim 53 of the '560 patent as not limiting because the term is not referenced in the body of claim 53 or any claim depending from claim 53, the term was not used as a basis for distinguishing the claim during prosecution, and the specification identifies a "dynamically expandable" ICL as a "feature" of the invention, which shows that the term does not add anything structural to the body of the claim. (D.I. 131 at 17). However, as discussed above, even though "dynamically expandable" itself is not included in the body of claim 53, "dynamically expandable" in claim 53's preamble describes the ICL, which is referenced in the claim's body. *See* '560 patent, 36:5–6, 36:13. The term "dynamically expandable" is thus part of the antecedent basis for the ICL referenced in claim 53's body. As such, I find that the term is limiting even though it is not itself referenced in the body of claim 53 or any dependent claim and even though the specification identifies a "dynamically expandable" ICL as a "feature" of the invention.

The fact that the term was not used as a basis for distinguishing the claim during prosecution does not prevent the term from limiting the claims. To be sure, "clear reliance on the preamble during prosecution to distinguish the claimed invention from the prior art transforms the preamble into a claim limitation," and "[w]ithout such reliance, . . . a preamble generally is not limiting when the claim body describes a structurally complete invention such that deletion of the preamble phrase does not affect the structure or steps of the claimed invention." *Catalina*, 289 F.3d at 808. But here, treating "dynamically expandable" as mere surplusage would affect the

structure of the claimed invention because to do so would impact the "ICL" referenced in the body of claim 53. Thus, I find that "dynamically expandable" limits claim 53 of the '560 patent.[5]

**B. Order of steps ('115 patent claims 1, 29, '560 patent claims 50, 53)**

a. *Plaintiff's proposed construction*: No construction needed. IPA disputes that specified elements of identified method claims must be performed in the order written.
b. *Defendant's proposed construction*: All method steps must be performed in the order written, including the "interpreting . . ." and "constructing . . ." or "determining . . ." steps.
c. *Court's construction*: The method steps need to be performed in the order listed.

The parties agree generally that the method steps must be performed in the order listed in the asserted claims, with some specifically delineated disagreements. (D.I. 178). They disagree over whether the "interpreting . . ." and "constructing . . ." or "determining . . ." steps listed in claims 1 and 29 of the '115 patent and claims 50 and 53 of the '560 patent must be performed in the order written. (D.I. 131 at 22–31; D.I. 178). I find that the steps need to be performed in the order written.

In their joint letter regarding claim construction, the parties laid out the disputed steps with bracketed lettering. For example, the disputed steps of claim 1 of the '115 patent state:

> [c] dynamically interpreting the arbitrarily complex goal expression, said act of interpreting further comprising:
>
> > [c(1)] generating one or more sub-goals expressed in the inter-agent language;
>
> [d] constructing a goal satisfaction plan wherein the goal satisfaction plan includes:
>
> > [d(1)] a suitable delegation of sub-goal requests to best complete the requested service request—by using reasoning that includes one or more of domain-

[5] While I am somewhat reluctant to rely upon the "life, meaning, and vitality" theory, I think "dynamically expandable" does give meaning to the claim. The term is not stating a purpose or intended use of the invention, so IPA's theory is that the phrase is "extoll[ing] the benefits" of the claim and "adds nothing structural to the claim that is not already captured in the body of the claim." (D.I. 131 at 17). I interpret IPA to be saying it makes no difference whether the term is limiting or non-limiting.

> independent coordination strategies, domain-specific reasoning, and application-specific reasoning comprising rules and learning algorithms.
>
> [d(2)] dispatching each of the sub-goals to a selected client agent for performance, based on a match between the sub-goal being dispatched and the registered functional capabilities of the selected client agent.

D.I. 178 at 1–2.

"Unless the steps of a method actually recite an order, the steps are not ordinarily construed to require one." *Interactive Gift Exp., Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1342 (Fed. Cir. 2001). However, the steps may still "implicitly require that they be performed in the order written" if, based on the claim language, "as a matter of logic or grammar, they must be performed in the order written." *Id.*; *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1369 (Fed. Cir. 2003). For example, "[s]ubsequent use of the definite articles 'the' or 'said' in a claim refers back to the same term recited earlier in the claim." *Wi-Lan, Inc. v. Apple, Inc.*, 811 F.3d 455, 462 (Fed. Cir. 2016). As a result, "[a]lthough not an ironclad rule, when the current step of a method claim refers to a previous step using the definite article 'the,' the claim language indicates that the previous step occurs sequentially before the current step." *Medtronic, Inc. v. Teleflex Life Scis. Ltd.*, 2024 WL 1208642, at *3 (Fed. Cir. March 21, 2024). If the claim language does not implicitly require an order, then the specification may "directly or implicitly require[] such a narrow construction." *Interactive Gift*, 256 F.3d at 1343. If neither the claim language nor the specification require an order, then the steps of a claim may be performed in any order. *Id.*

Google argues that the disputed steps must be performed in the order they are written because the subsequent steps contain antecedent bases introduced in the prior steps. (D.I. 131 at 25–27; D.I. 178 at 6). For example, in claim 1 of the '115 patent, step [c(1)], a sub-step of the "interpreting . . ." step, recites "generating one or more sub-goals," and then step [d(2)], a sub-step of the "constructing . . ." step, recites "dispatching each of the sub-goals," suggesting that the sub-

goals in step [d(2)] are a reference to the sub-goals introduced in step [c(1)]. (D.I. 178 at 1–2). In claim 29 of the '115 patent, the "interpreting . . ." step recites "interpreting a service request in order to determine a base goal," and then a sub-step of the "constructing . . ." step recites "determining sub-goals required in completing the base goal," suggesting that the base goal in the later step references the base goal introduced in the earlier step. (*Id.* at 2). Similarly, in claims 50 and 53 of the '560 patent, the earlier of the disputed steps recite "a base goal," and the later of the disputed steps in the same claim refer to "the base goal." (*Id.* at 3–4).

In response, IPA argues that antecedent language in a claim's steps does not necessarily mean that the claims steps must be performed in the order they are written. (D.I. 131 at 29–30; D.I. 178 at 5). I agree with Google. Here, as described in *Wi-Lan*, the later steps of the disputed claims use "the," a definite article, to refer back to the antecedent bases recited in earlier steps of those claims. As a result, "the claim language indicates that the previous step[s] occur[] sequentially before the [later] step[s]." *Medtronic*, 2024 WL 1208642, at *3. For example, the later step of "dispatching each of the sub-goals," in claim 1 of the '115 patent can only logically occur after the earlier step of "generating one or more sub-goals" because the earlier step gives rise to "the sub-goals" referenced in the later step. Similarly, the later steps involving "the base goal" in claim 29 of the '115 patent and claims 50 and 53 of the '560 patent can only occur after the earlier steps that give rise to "a base goal." Thus, the claim language implicitly requires that the steps must occur sequentially "as a matter of logic or grammar." *Altiris*, 318 F.3d at 1369.

I therefore adopt Google's position that the specified limitations must be performed in order because of the claims' antecedent bases.

**C. "registering a description of each active client agent's functional capabilities as corresponding registered functional capabilities" ('115 patent claim 1) / "registering the specific agent together with the new agent profile within the agent registry"**

**('115 patent claim 30) / "registering one or more capabilities for each of the electronic agents" ('128 patent claim 22)**

a. *Plaintiff's proposed construction*: No construction necessary. If the Court finds construction is necessary, IPA asks (1) the three phrases be considered separately and (2) the Court give each of these phrases their plain and ordinary meaning.
b. *Defendant's proposed construction*: "registering a description of [each active client agent's / the specific agent's] functional capabilities, transmitted to the facilitator by [each agent / the specific agent], as corresponding registered functional capabilities."
c. *Court's construction*: Plain and ordinary meaning. The terms do not require that the registering requires transmission of the agent's capabilities to the facilitator.

For this set of terms (as well as the following two sets of terms), the parties' main dispute is whether registering an agent requires transmitting the agent's capabilities to a facilitator. I find that registering an agent does not require transmitting the agent's capabilities to a facilitator and that the plain and ordinary meaning applies.

Google argues that IPA's position improperly contradicts its previous arguments about the facilitator's role in agent registration in *IPA/Amazon*. (D.I. 131 at 33–34). I reject this argument. IPA appears to have consistently urged that the patents at issue teach that it is possible, but not necessary, for a facilitator to play a role in agent registration. In response to Google's argument that IPA's current position is inconsistent with the position it took in *IPA/Amazon*, IPA points out that its proposed construction in *IPA/Amazon* was "agnostic as to whether the capabilities are put in the registry by the agent or the facilitator," and thus, IPA's positions have been consistent. (D.I. 131 at 40–41). I agree with IPA. In *IPA/Amazon*, IPA argued that a "facilitator can [] register an agent" but that an agent can register itself as well. (*IPA/Amazon*, D.I. 118 at 62–63). Here, IPA argues that "plain and ordinary meaning should apply, which is agnostic as to the involvement of a facilitator in the agent-registration process." (D.I. 131 at 40–41). In each of IPA's arguments, a facilitator is capable of, but not necessary to, agent registration. In neither case did IPA request that I construe the patent terms at issue as requiring a facilitator for agent registration.

Further, Google's proposed construction improperly imports limitations from the specification to the claims and disregards meaningful differences in language across different claims. Google argues that the '115 patent's specification ties the facilitator's role in agent registration to the invention's purpose and that Figure 4 and Figure 8 in the '115 patent's specification illustrate the transmission of an agent's capabilities to a facilitator as part of agent registration. (*Id.* at 35–39). However, "[w]hile claim terms are understood in light of the specification, a claim construction must not import limitations from the specification into the claims." *Deere*, 703 F.3d at 1354 (citing *Phillips*, 415 F.3d at 1323). The fact that the facilitator's role in agent registration advances the invention's purpose does not mean that the facilitator is required for agent registration. Further, according to the specification, Figure 4 only "presents a structure typical of one small system" of the invention, and Figure 8 merely "depicts operations . . . in accordance with a preferred embodiment." '115 patent, 5:26–27, 5:38–40. The specification thus makes it clear that Figures 4 and 8 are not meant to depict all possible methods of agent registration. As a result, I reject Google's argument that the specification teaches that a facilitator is necessary for registering an agent.

Meaningful differences in language across claims demonstrate that the addition of a facilitator into the terms at issue here is improper and that the three terms should be construed separately, not together. "[D]ifferent claim terms are presumed to have different meanings." *Helmsderfer v. Bobrick Washroom Equipment, Inc.*, 527 F.3d 1379, 1382 (Fed. Cir. 2008). Further, the doctrine of claim differentiation, which is "based on the common sense notion that different words or phrases used in separate claims are presumed to indicate that the claims have different meanings and scope," raises a presumption that different terms in separate claims have

different meanings. *Andersen Corp. v. Fiber Composites, LLC*, 474 F.3d 1361, 1369 (Fed. Cir. 2007) (cleaned up).

As IPA stated at oral argument, the patentee "knew how to add 'facilitator'" to claims "when it wanted to." (Markman Tr. at 68:25–69:2). For example, while claim 1 of the '115 patent does not contain the word "facilitator," claims 3 and 31 do contain "facilitator." '115 patent, 29:62, 32:46. I agree with IPA that these differences are meaningful. The omission of "facilitator" in claim 1's discussion of agent registration indicates that agent registration may take place without a facilitator, as IPA argues in this case and argued in *IPA/Amazon*. (D.I. 131 at 40–41). Thus, the omission of "facilitator" in claim 1 raises a presumption that the claims have different meanings. Google fails to rebut this presumption, and its attempt to add a "facilitator" into claim 1 is thus incorrect. As IPA notes, adopting Google's proposed construction would import a facilitator into claim 1 despite claim 1 not reciting a facilitator. (*Id.* at 40).

Further, Google's proposed construction would impose the same meaning on all three of the disputed terms here despite their differences in language. Adopting Google's proposed construction would also ignore the distinction between "capabilities" in claim 22 of the '128 patent and "functional capabilities" in claim 1 of the '115 patent. Google argues that "functional capabilities" and "capabilities" have essentially the same meaning because the specification of the '115 patent "only contemplates capabilities that are functional." (*Id.* at 39). However, the specification does not define "capabilities" as being functional, so the addition of the word "functional" in some claim terms and not others raises a presumption of different meanings. I find that Google has not rebutted this presumption and that the plain and ordinary meaning applies.

**D. "providing an agent registry data structure" ('115 patent claims 9 & 10 by virtue of dependency on claim 5) / "providing an agent registry that declares capabilities of service providing electronic agents currently active within the distributed computing environment" ('115 patent claim 29) / "providing a plurality of**

**synchronized agent registries each declaring capabilities of service-providing agents currently active within the distributed computing environment" ('560 patent claim 50) / "providing a plurality of synchronized agent registries each declaring a set of functional capabilities for one or more of the autonomous service-providing electronic agents" ('560 patent claim 53)**

a. *Plaintiff's proposed construction*: No construction necessary. If the Court finds construction is necessary, IPA asks (1) the four phrases be considered separately and (2) the Court give each of these phrases their plain and ordinary meaning.
b. *Defendant's proposed construction*: "providing [an agent registry / a plurality of synchronized agent registries] that declare[s] capabilities of service-providing electronic agents, transmitted to the facilitator by the agents, currently active within the distributed computing environment."
c. *Court's construction*: Plain and ordinary meaning. There is no requirement of transmission of the agents' capabilities to a facilitator.

The parties disagree over whether this set of terms should be construed such that a "registry" requires transmitting agents' capabilities to a facilitator. I find that a "registry" does not require transmitting agents' capabilities to a facilitator and that the plain and ordinary meaning applies.

Google argues that the Court should construe this set of "registry" terms to require capabilities that are "transmitted to the facilitator by the agents" for the same reasons that Google argued for its proposed construction of the third set of disputed terms, the "registering" terms, above. (*Id.* at 46). In response, IPA argues that Google's proposed construction improperly adds language from other claim limitations into these terms and ignores meaningful differences in claim language surrounding the disputed terms. (*Id.* at 44–45). IPA also argues that, if the Court chooses to construe these terms, then plain and ordinary meaning should govern based on the Court's previous constructions of "agent registry" and "capability." (*Id.* at 44–45 (citing *IPA/Amazon*, D.I. 128, at 2; *IPA/Microsoft*, D.I. 143, at 5)). I agree with IPA.

Google seeks to improperly add the transmission of agents' capabilities to a facilitator into this set of "registry" terms. For the same reasons that I reject Google's proposed construction of the "registering" terms above, I reject Google's proposed construction of this set of "registry"

terms. As discussed above, "a claim construction must not import limitations from the specification into the claims." *Deere*, 703 F.3d at 1354. The specification diagrams on which Google relies only depict the facilitator's role in agent registration in "a structure typical of one small system" and "a preferred embodiment." '115 patent, 5:26–27, 5:39–40. Thus, I reject Google's argument that a "registry" requires transmission of agents' capabilities to a facilitator.

Further, Google's proposed construction fails because Google does not rebut the presumption of difference in meaning raised by the differences in language in these claims. Claim 29 of the '115 patent and claims 50 and 53 of the '560 patent each recite registries that "declare" a set of agent capabilities, while claims 9 and 10 of the '115 patent (which depend from claim 5 of that patent) do not specify that the "agent registry" declares anything. '115 patent, 30:1–3, 30:13–19, 31:56–58; '560 patent, 34:54–57, 36:8–11. Further, claim 29 of the '115 patent and claim 50 of the '560 patent recite "capabilities" of service-providing agents, while claim 53 of the '560 patent recites "functional capabilities." '115 patent, 31:56; '560 patent, 34:55, 36:9. Under the doctrine of claim differentiation, these differences raise a "presumption" that the claims have "significant" differences in meaning. *Andersen*, 474 F.3d at 1369. As discussed above, Google argues that "functional capabilities" and "capabilities" have essentially the same meaning, but I find that this argument fails. *See supra* IV.C.

By construing this set of terms as having its plain and ordinary meaning, I am also maintaining consistency with my previous constructions. As IPA points out, I previously construed "agent registry" as having its plain and ordinary meaning and "capability" as meaning "a function an agent can perform." (*IPA/Amazon*, D.I. 128, at 2; *Amazon/Microsoft*, D.I. 143, at 5). Because the terms at issue here refer to the "capabilities" of agents, I find that my previous construction of "capability" is consistent with the plain and ordinary meaning of these terms. I

thus find that these terms should be construed separately and that the plain and ordinary meaning applies.

**E. "active client agent" / "active agent" / "agent currently active" ('115 patent claims 1, 9–10, 29, 33, 35–36, '560 patent claim 50)**

a. *Plaintiff's proposed construction*: No construction necessary. If the Court determines construction is needed, then these terms should be construed to mean "agent that is available to receive requests."
b. *Defendant's proposed construction*: "Agent currently maintaining a communication link with the facilitator agent controlling the agent registry."
c. *Court's construction*: "Agent that is available to receive requests."

The parties disagree on whether an agent that is "active" must maintain a link with a facilitator. I adopt IPA's alternative proposal.

Google contends that its proposed construction reflects the language of the claims, which describes agents as "active" when they participate in the community by communicating with the facilitator. (D.I. 131 at 48). In support of its position, Google points to claim 29 and dependent claim 30 of the '115 patent. (*Id.* at 48). Claim 29 recites, "A computer program . . . comprising computer executable instructions for: providing an agent registry that declares capabilities of service-providing electronic agents currently active within the distributed computing environment," which enables "selecting service-providing electronic agents from the agent registry suitable for performing the determined sub-goals." '115 patent, 31:48–32:19. Claim 30 recites, "A computer program as recited in claim 29 wherein the computer executable instruction for providing an agent registry includes . . . establishing a bi-directional communication link between the specific agent and a facilitator agent controlling the agent registry." *Id.* at 32:24–31.

However, these claims do not support Google's argument that an agent must maintain a link with a facilitator to be "active." Claim 30 does not require that "providing an agent registry" of "active" agents must involve establishing a link between an agent and a facilitator. Claim 30 merely provides one embodiment of claim 29's "computer program" and thereby shows that

"providing an agent registry" of "active" agents could involve establishing a link between an agent a facilitator. Further, as IPA argues, even though the claims contemplate establishing a connection between an agent and a facilitator for agent registration, the claims do not require that every active agent must maintain such a connection. (D.I. 131 at 50). Thus, I reject Google's argument that the claim language supports its proposed construction.

Google argues that its proposed construction reflects the specification. (*Id.* at 48–49). Google points to examples in which the specification of the '115 patent refers to agents that are "active" or "participate" in connection with a link to a facilitator. (*Id.* at 48–49). Yet, the examples given by Google are taken from descriptions of preferred and example embodiments and do not require that every active agent must maintain a link with a facilitator. '115 patent, 5:28–29, 7:13, 12:2, 17:42–44. Further, the specification contains multiple descriptions of participating agents that do not reference a link between the participating agents and a facilitator. *Id.* at 9:20–24, 19:10–12. As a result, Google fails to show that the specification requires an active agent to maintain a connection with a facilitator.

Google advances its proposed construction by contending that the claims refer to "active" agents only in the context of registration and active participation in the community. (D.I. 131 at 9). As stated above, neither the claims nor the specification tie an agent's participation in the community to the agent maintaining a connection with a facilitator. Regarding registration, Google's position hinges on the same arguments that Google made with respect to the third and fourth sets of disputed terms in this case. *See supra* IV.C–IV.D. For the same reasons that I rejected Google's arguments that the "registering" and "registry" terms require the transmission of agents' capabilities to a facilitator, I reject Google's argument that an "active" agent in the context of registration requires a link with a facilitator. *See id.*

Because the words "agent," "active," and "client agent" are well understood, I adopt IPA's proposed construction and find that no construction is necessary.

**F. "ICL" / "inter-agent communication language" / "inter-agent language" (all claims)**

a. *Plaintiff's proposed construction*: "An interface, communication, and task coordination language."
b. *Defendant's proposed construction*: "A non-RPC interface, communication, and task coordination language."
c. *Court's construction*: TBD.

The parties dispute whether the patents at issue disavow remote procedure call ("RPC") from the scope of the claimed inter-agent communication language ("ICL"). I find that the patents do not disavow RPC and adopt IPA's proposed construction.

I recently summarized the standard for assessing disavowal:

> Disavowal requires the specification to clearly show that the "invention does not include a particular feature." *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1341 (Fed. Cir. 2001). The specification must be "both so clear as to show reasonably clarity and deliberateness, and so unmistakable as to be unambiguous evidence of disclaimer." *Dealertrack, Inc. v. Huber*, 674 F.3d 1315, 1322 (Fed. Cir. 2012) (internal citation omitted). To find disavowal of claim scope through disparagement of a particular feature, I must determine whether "the specification goes well beyond expressing the patentee's preference . . . [such that] its repeated derogatory statements about [a particular embodiment] reasonably may be viewed as a disavowal. *Chicago Bd. Options Exchange, Inc. v. Int'l Sec. Exch., LLC*, 677 F.3d 1361, 1372 (Fed. Cir. 2012); *see also Openwave Sys., Inc. v. Apple, Inc.*, 808 F.3d 509, 513 (Fed. Cir. 2015).

*Allergan, Inc. v. Revance Therapeutics, Inc.*, 2023 WL 5562417, at *5 (D. Del. Aug. 29, 2023).

"[T]he words of a claim are generally given their ordinary and customary meaning . . . [which is] the meaning that the term would have to a person of ordinary skill in the art [(POSA)] in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips*, 415 F.3d at 1312–13. But "[a] court should not give a claim term its ordinary meaning 'if the patentee acted as his own lexicographer and clearly set forth a definition of the disputed claim term in either the specification or prosecution history.'" *San Rocco Therapeutics, LLC v.*

*Bluebird Bio, Inc.*, 2024 WL 2747111, at *3 (D. Del. May 29, 2024) (citing *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002)).

Google contends that the patentee clearly disavowed RPC by disparaging it and distinguishing it from the invention in the specification of the '115 patent. (D.I. 131 at 56–59). The specification mentions RPC three times. First, the specification states that RPC is a "restriction" of a programming approach because RPCs' "single thread of execution model does not facilitate programming to exploit the potential for parallel computation that one would expect in a distributed environment." '115 patent, 3:30–35. The specification states, "In addition, RPC uses a blocking (synchronous) scheme that does not scale well for high-volume transactions." '115 patent, 3:35–37. Finally, the specification lists "four components" that enable "[e]ffective" agent-based systems and notes, "Such mechanisms permit a much richer style of interaction among participants than can be expressed using a distributed object's RPC model." *Id.* at 4:21–32.

I find that, while the specification does disparage RPC, it only disavows the version of RPC as it was understood by POSAs at the time of invention. By describing the "mechanisms" that enable agent-based systems to "permit a much richer style of interaction than can be expressed using . . . RPC," the specification of the '115 patent distinguishes RPC from agent-based systems, which support the claimed invention. *Id.* at 4:21–32. The specification thus "clearly show[s]" that the claimed invention "does not include" RPC. *Allergan*, 2023 WL 5562417 at *5; *SciMed*, 242 F.3d at 1341. Further, by describing reliance on RPC as a "restriction" and stating that RPC "does not scale well for high-volume transactions," the specification "goes well beyond expressing the patentee's preference" and makes "repeated derogatory statements about" RPC that "reasonably may be viewed as a disavowal." '115 patent, 3:30–37; *Chicago Bd.*, 677 F.3d at 1372.

Yet, while the specification disparaged RPC as it was performed in 1999 the disavowal of RPC as it was understood during the relevant time of infringement, which at the earliest is February 26, 2012, does not necessarily follow. The words in a patent are understood according to "the meaning that the term would have to a person of ordinary skill in the art [(POSA)] in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips*, 415 F.3d at 1312–13. The application for the '115 patent was filed on January 5, 1999. (D.I. 1 at 12). The 1999 version of RPC lacked the ability to be asynchronous. (D.I. 131 at 54). In accordance with this lack, the specification states that one of the drawbacks of RPC is that "RPC uses a blocking (synchronous) scheme." '115 patent, 3:36–37. Google contends that this statement amounts to disparagement of RPCs generally, including modern RPCs. (D.I. 131 at 56–57). I think Google is wrong. The "RPC" in the '115 patent reflects the 1999 version of RPC, which is how a POSA "at the time of the invention" would have understood "RPC." *Phillips*, 415 F.3d at 1312–13. Google's proposed construction that adding "non-RPC" to Plaintiff's proposed construction would capture what was disavowed is wrong.

IPA asserts, "Over time, RPCs were developed to be asynchronous and all operations to be performed in parallel." (D.I. 131 at 54). There is back and forth between the parties on the more recent nature of RPCs. I would characterize the back and forth as attorney argument. I think the nature and uses of RPCs at the relevant time is something that needs to be based on evidence, not attorney argument. Thus, I need the parties to meet and confer and to propose an exchange of expert reports with an evidentiary hearing to follow.

In response to the argument that only a certain type of RPC was disavowed, Google argues that subsequent developments in technology are irrelevant because patent terms are construed as understood by a POSA "at the time of invention" and that contemplating "types" of RPC

improperly projects knowledge of later technology to the POSA at the time of the invention. (D.I. 131 at 59, 68–69). I reject Google's argument. The patent suggests that in 1999, POSAs did not understand RPCs to be capable of being asynchronous. '115 patent, 3:30–37. Subsequent developments in RPC technology are relevant because the developments may mean that the RPC of a later time is quite different than the RPC of 1999. Further, contemplating "types" of RPC does not improperly project knowledge of later technology to POSAs in 1999. The specification of the '151 patent disavowed RPC as RPC was understood by POSAs at the time, but later developments in technology may have led to the existence of versions of RPC that are different from the 1999 version of RPC. The patentee could not disavow a feature that did not yet exist. As a result, it may very well be that what the patentee disavowed has to be described functionally (i.e., a language that does not rely upon asynchronous operation). I need evidence to be able to resolve this issue.

## V. CONCLUSION

Within five days the parties shall submit a proposed order consistent with this Memorandum Opinion.